**In re RICHARDSON–MERRELL, INC.
"BENDECTIN" PRODUCTS
LIABILITY LITIGATION.**

**MDL No. 486.**

United States District Court,
S.D. Ohio, W.D.

Sept. 17, 1985.

Stanley M. Chesley, Cincinnati, Ohio, Allen Eaton, Washington, D.C., George Kokus, Miami, Fla., Thomas Bleakley, Detroit, Mich., for plaintiff.

Frank C. Woodside, III, Cincinnati, Ohio, for defendant.

INDEX

| | | Page Nos. |
|---|---|---|
| I. | Introduction | 1215–1221 |
| II. | Asserted Errors—Miscellaneous A1–A13 | 1221–1228 |
| III. | Asserted Errors Involving Exculsion of Evidence at Trial B1–B15 | 1228–1240 |
| IV. | Asserted Errors Regarding Discovery C1–C6 | 1240–1242 |
| V. | Asserted Errors Involving Evidence Admitted at Trial D1–D4 | 1242–1243 |
| VI. | Asserted Error in Entering Judgment on the Verdict E | 1243–1244 |
| VII. | Asserted Error Concerning Jury Instruction on Proximate Cause F | 1244–1245 |
| VIII. | Asserted Error Concerning Jury Requested Jury Instruction Regarding FDA G | 1245 |
| IX. | Asserted Errors by Minority Members of Lead Counsel Committee H1–H3 | 1245–1246 |
| X. | Asserted Errors Raised Only in Plaintiffs Memorandum I1–I7 | 1246–1249 |
| XI. | Conclusion | 1249 |
| XII. | Appendix A: Order No. 1066, Nov. 16, 1983 | |
| XIII. | Appendix B: Standard Juror Questionnaire | |
| XIV. | Appendix C: Bendectin Supplemental Juror Questionnaire | |
| XV. | Appendix D: Jury Instructions | |
| XVI. | Appendix E: Order No. 2862, Feb. 19, 1985 | |
| XVII. | Appendix F: In Re Bendectin Products Liability Litigation, 97 F.R.D. 481 | |

## I. INTRODUCTION

*CARL B. RUBIN, Chief Judge.*

This matter is before the Court on the Motions of plaintiff for Judgment Non Obstante Veredicto and for a New Trial, upon the responses thereto by defendant and upon a hearing held in open court on August 2, 1985.

There is an inherent problem of communication between trial courts and appellate courts. The trial judge's reasons for pro-

ceeding as he did are explained to a reviewing court in a secondhand fashion. It is only from the perceptions of the litigating parties that his analysis and reasoning may be determined. All too often, those perceptions are colored by adversarial positions and may or may not reflect accurate reasons for the action taken. It will be the purpose of this Order to deal not only with each issue raised by plaintiffs but also to indicate the thought process and the authority relied upon for the action taken.

The "Bendectin Litigation" in this Court began with an assignment of 47 cases by the Panel on Multi-District Litigation (Panel) in February of 1982. Eighteen months were allotted by the Court for pre-trial discovery. Five attorneys were selected as Lead Counsel in pre-trial order #1 dated May 5, 1982. (Doc. no. 9A). Between May of 1982, and March of 1985, 582 additional cases were referred by the Panel and 557 cases were filed in the Southern District of Ohio.

A. In an effort to try all common issues of liability, the Court, on November 16, 1983, issued an Order (doc. no. 1066) (See Appendix A) consolidating all cases filed in the Southern District of Ohio, those filed in the Northern District of Ohio and referred by the Panel, and those referred by the Panel whose attorneys wished to be involved. No litigant who had not individually invoked the jurisdiction of this Court was required to participate in the common issues trial unless such litigant through his attorney specifically "opted in" (doc. no. 2277). Such "opt ins" were barred after March 1, 1985 (doc. no. 2866). All cases filed after that date in the Southern District of Ohio or referred by the Panel thereafter were excluded. At the cut-off date of March 1, 1985, 557 cases originating in the Southern District of Ohio and 261 cases

which had opted in were thereafter subject to the decision of the jury.[1]

Trial was originally scheduled to begin in June of 1984. On June 11, 1984, a jury was impaneled. Before actual trial began, an offer of settlement in the total sum of $120 million for all Bendectin cases, both current and future, was made by Defendant Merrell-Dow Pharmaceuticals, Inc. (Merrell). The pendency of that offer caused the Court to conclude that trial should not begin and the impaneled jury was thereupon dismissed.

The conditions of such offer required a certification of a settlement class. That certification was reviewed by the United States Court of Appeals for the Sixth Circuit and deemed to be beyond the power of this Court. *See In re: Bendectin Products Liability Litigation,* 749 F.2d 300 (6th Cir.1984). This Court thereupon directed that trial begin on February 4, 1985, with a new jury.

The large number of cases involved required some unusual procedures. To assist counsel in their jury selection, the standard jury questionnaire form (Appendix B) was supplemented by an additional questionnaire (Appendix C) designed jointly by all counsel. The additional questionnaire was mailed to prospective jurors and returned before the beginning of trial. Based upon an examination of that second questionnaire and by agreement of counsel, some prospective jurors were excused. Those excused were persons employed by Merrell or its associated companies, or persons who were parents of children with birth defects.

Voir dire was conducted by the Court in accordance with the procedure outlined in Federal Rule of Civil Procedure 47(a) and supplemented with questions submitted by counsel. At the conclusion of the voir dire in open court, counsel and the Court retired to Chambers where seven challenges per

---

**1.** The total number of cases involved in the "Bendectin" litigation is not precise. In some instances cases were filed both in the Southern District of Ohio and elsewhere. This Order will involve 818 cases consisting of 557 filed in the Southern District of Ohio and 261 assigned by the Panel which "opted in".

It will not involve 368 cases assigned by the Panel which either did not opt in or were otherwise disposed of. For statistical purposes there were a total of 1186 Bendectin cases with which this Court had some contact.

side were exercised (T. 52–53). By agreement, six jurors were selected together with six alternates.

It should be noted that an offer had been made by the Court for selection of a jury with special qualifications. As early as May of 1984, it was obvious to the parties that in the first portion of the trial there would be technical and complex testimony by experts on the issue of causation. The Court discussed with counsel selecting a jury composed of persons knowledgeable in the field or a jury of those persons having the most formal education available in the jury panel.

Two terms were used for descriptive purposes. The jury of persons knowledgeable in the field was referred to as a "blue, blue ribbon jury" and those who had the greatest amount of formal education were referred to as a "blue ribbon jury." Neither of these concepts is recognized in the Federal Rules of Civil Procedure. Only by agreement of all parties could either have been used. The following excerpts from a conference held May 11, 1984 may be instructive. At page 9 of the transcript, the following appears:

THE COURT: If this is going to be a trial question that will rely on expert testimony, would you give any consideration to the the the phrase Mrs. Ringenbach ("Law Clerk") coined which I think is very discriptive, the "Blue, Blue Ribbon Jury." A Blue, Blue Ribbon Jury would be composed of people knowledgeable in the field that you could agree upon. I don't care, 15, 20 and then we could use the device of a struck jury where you strike off those that you considered unacceptable.

Now, this has the advantage of people who would be knowledgeable in the field. It has a very distinct disadvantage that they may well have already made up their minds. *I pass this on as a suggestion.* (Emphasis added) Is there any conceivable interest in it?

DR. WOODSIDE: (Counsel for Defendant)

We would be interested.

MR. CHESLEY: (Counsel for Plaintiffs)

Your Honor, we would not be interested.

On page 12 of the transcript of such conference, the following appears:

THE COURT: If you will not accept a blue, blue ribbon jury, will you accept a blue ribbon jury?

MR. CHESLEY: No, Judge.... I want to explain our position.

THE COURT: I don't care what your position is.

MR. CHESLEY: I don't want to sit here and look like we are adamant.

THE COURT: You are not required. This is something that is separate and apart from the rules of the United States District Court and of this local court as well. If you say 'I don't like the idea,' period.

The jury impaneled in February 1985, consisted of five women and one man. Three substitutions were ultimately made. Juror no. 3 became ill early on and was replaced. Her replacement, Mr. William O'Shaunnessy, discovered several weeks into trial that he was acquainted with the mother of defendant's counsel. When this matter was called to the Court's attention, Mr. O'Schaunnessy was excused. (T. 2591–2609; 2785–2786, February 27, 1985). Subsequently, Mr. O'Shaunnessy's replacement, a Mr. Guth, likewise became ill and he was replaced by Joyce Lee Beck.

The jury that deliberated consisted of five women and one man. The jurors averaged 44.75 years in age. Their education ranged from a failure to attend high school by one to the possession of a graduate degree by another. Specifically, one juror had no high school, one had quit high school at the end of the 11th grade, one had graduated from high school, one had graduated from high school and taken technical training as a practical nurse, one had a Bachelor of Arts Degree and one both a Bachelor's and a Master's Degree. The jurors were the parents of 13 children.

Two of the jurors had none, two had one each, one had three and another had eight.

It is a supportable, although irrelevant, hypothesis that a jury of five women and one man called upon to deal with a product involved with pregnancy would be at least sympathetic to problems occasioned by such pregnancy.

The presentation of evidence required a total of 21 days. During that time, 10 expert witnesses were presented on behalf of plaintiffs, eight on direct and two on rebuttal and nine expert witnesses were presented on behalf of defendant. Plaintiffs required 41 hours 15 minutes to present their case both by direct, cross and rebuttal, while defendant required 31 hours, 30 minutes to present its case on direct and on cross.[2] Final argument and instruction consumed an additional day. The jury deliberated less than one day.

There is an understandable tendency among trial lawyers faced with the obligation of overturning an unfavorable verdict to create an impression that somehow they did not receive a fair trial. The Court does not state this in a critical fashion. Trial lawyers as a group are intense, energetic and dedicated lawyers. As advocates, they would regard any unfavorable ruling in the same fashion as any batter who is called out at first. For purposes only of placing this trial in an appropriate context, the Court sets forth herein its underlying philosophy of trial procedures.

Under our system, there is a burden of going forward imposed upon a plaintiff. If he does not prevail by a preponderance of the evidence, he must lose. Evidence is not subject to precise calibration. Often it appears to be in equipoise. To carry the baseball analogy further, the Court favors, where applicable, an unwritten rule of baseball umpiring. The rule may be simply stated as follows: "In a tie, favor the runner." In the same fashion, on close questions, the offense, i.e., the plaintiff, should be given the benefit of the doubt.

The principal of "tie, favor the runner" was employed in a five separate disputes of some magnitude, all of which resulted in decisions favorable to the plaintiffs.

*First,* juror William O'Shaunnessy, referred to above, coaches swimming teams. On one occasion, after several weeks of trial, the mother of Dr. Frank Woodside, defense counsel, appeared in the courtroom as a spectator. Mrs. Woodside is likewise a swimmer. Mr. O'Shaunnessy had not previously connected her with Dr. Woodside nor was she more than an acquaintance of his. He simply recognized her and made that fact known to the Courtroom Deputy. It is debatable whether or not that mere acquaintance should be grounds for removal. A remote possibility of prejudice to the plaintiffs, did exist and rather than conduct an inquiry, it was the Court's decision to excuse him. The advantage of this determination, if any, went to the plaintiffs.

*Second,* among the witnesses presented by the plaintiffs on videotape was Dr. Johannes Theirsch. Dr. Theirsch spoke with a heavy German accent. As a result, his taped testimony lacked the clarity of a live witness. In order to equalize the situation and to assist the jury in following Dr. Theirsch's testimony, the Court *sua sponte* directed counsel to distribute to the jurors a transcript of the deposition. There is a danger in this technique because alone of all the expert witnesses, Dr. Theirsch's testimony was thus given special attention. The advantage in this decision went to the plaintiffs.

*Third,* as a result of the complexity of the pre-trial proceedings and the thousands of documents involved, it developed late in the trial that plaintiffs had unwittingly agreed to a stipulation waiving the hearsay objection to certain documents which the defendant proposed to use. The colloquy concerning this situation began on page

---

**2.** Twelve hours and forty-five minutes of testimony was presented by videotape and deposi-

tion. Such time was arbitrarily divided equally.

1928 of the transcript. Excerpts of it are instructive.

Dr. WOODSIDE: Your Honor, I want to read to you from the Court's Order which was agreed upon by counsel. 'Under such circumstances, the Court ruled that hearsay objections hereto are overruled with respect to the studies themselves.'

What happened was, in agreement for us not to go take depositions all around the world, they agreed to waive the hearsay objections and the Court so ruled.

THE COURT: I'll hold you to it.

MR. EATON: (Counsel for Plaintiff)

We agreed with respect to their authenticity.

THE COURT: No, you agreed to more that that. You agreed to waive a hearsay objection.

. . . . .

(T. 1935)

MR. EATON: Well, Your Honor, if that is the case, I would respectfully request the permission to withdraw that stipulation because *I think it's going to be tremendously unfair to the plaintiffs.* (Emphasis added)

. . . . .

(T. 1943)

MR. BLEAKLEY: I have taken these things on balance and in view of the clear mandate of Rule 803.18 (Rule 803, exception 18) that even if we had stipulated, we would request relief from it. The Court absolutely has discretion to do it under the *Northwest Mutual* case we cited to the Court. That would be the plaintiffs' position.

THE COURT: Frankly, Mr. Bleakley, Mr. Eaton, that last sentence is the most significant one I have heard. That's what I have to look at. *If, in fact, the plaintiffs are damaged by this, that is a different matter.* (Emphasis added)

. . . . .

(T. 1955)

THE COURT: At this precise time, I am not going to permit this to be displayed to the jury. I will reserve the question of admissibility until a later date but at this moment, I will ask you to proceed without the jury having them in front of them.

The documents in question despite the waiver of the hearsay objection were never presented to the jury and were never admitted into evidence in the case. While there is no question that the plaintiffs, perhaps unintentionally, had agreed to admissibility of some potentially damaging exhibits, the Court relieved them of their error. The Court also notes in passing certain colloquy between plaintiffs' counsel and the Court as it may bear upon the advisability of a formally educated jury. The following appears at page 1940 of the transcript.

MR. BLEAKLEY: (Counsel for Plaintiffs)

For example, Dr. Smithells received a letter from Dr. Rothman who is a colleague of Dr. McMahon at the Harvard Epidemiology Department very seriously criticizing not only the conclusions that Dr. Smithells had drawn but suggesting the fact his study did not prove the safety of Bendectin. To hand a jury that is untrained in analyzing this—

THE COURT: One comment on this, Mr. Bleakley, and I won't interrupt any more. I made an offer to counsel in this instance to select a jury with the maximum amount of formal education available. You know who turned it down? It was plaintiffs' counsel not defendant. So don't argue to me now about the fact that we have a jury that does not have a great deal of formal education. You may proceed.

MR. BLEAKLEY: Your Honor, that was simply not my point.

THE COURT: Yeah, but it's my point. If you are concerned over the fact that we are giving technical information, I agree with you. *But I point out that an effort was made to obtain a jury with the maximum amount of formal education and* that offer was declined by plaintiffs' counsel. (Emphasis added)

*Fourth,* in each instance when an expert witness was presented, the Court read selected qualifications submitted by counsel and advised the jury that the witness in question qualified as an expert and could give opinions and could give reasons for the opinions.[3] This assertion, however, was qualified by jury instruction no. 5006 (*See* Appendix D) which indicated the manner in which expert testimony was to be received.

On only one instance did an opposing party object to the expertise of a given witness. Dr. James Goddard was called by the defendant on February 26. Plaintiffs questioned his expertise and were accorded the opportunity to conduct voir dire in the presence of the jury before Dr. Goddard testified. (T. 2567–72). In that instance, the Court did not instruct the jury that Dr. Goddard qualified as an expert and instead made the following statement:

"The plaintiffs in this case question whether or not Dr. Goddard qualifies as an expert. Accordingly, I will permit a representative of plaintiffs counsel to interrogate this witness, and the ultimate question of whether or not he qualifies as an expert is up to you." (T. 2566).

Alone, of all the experts who testified, Dr. Goddard's qualifications were thus questioned in front of the jury. It is obviously not possible to quantify the advantage to a plaintiff who questions a witness's expertise. Since Dr. Goddard alone was subjected to this inquiry, it would seem that some advantage went to the plaintiffs.

*Fifth,* the Court ruled favorably to the plaintiffs in the matter of approval by the Food and Drug Administration (FDA) of the product Bendectin. (*See* Appendix E Order 2862 Feb. 19, 1985) A persuasive argument can be made that the action of the FDA bears upon the question of causation. It can be argued that the actions of a public agency are admissible in accordance with exception 8 to Federal Rule of Evi-

dence 803. Even the traditional balancing test of probative value versus prejudicial effect would suggest a ruling against the plaintiffs' position. The action of the FDA is probative on the question of causation since that agency is charged with the obligation of insuring that drugs sold on the market are subjected to rigorous testing. A determination of drug safety has no "prejudicial" effect other than the effect of any unfavorable evidence.

The Court determined, however, that the FDA's approval was no better than the tests it relied upon at the time the approval was issued sometime in the early 1960's. In the sense that the imprimatur of the federal government which was indicative only of the state of the art at that time could, at least, be confusing, the Court concluded that the evidence should not be admitted. The plaintiffs were saved, thereby, from the additional task of seeking to demonstrate that the tests the FDA relied upon were inadequate.

On the general issue of whether or not the plaintiffs were permitted to present their case fully and adequately, an examination of the exhibits submitted to the jury is pertinent. Plaintiffs offered 142 exhibits. Of these, 95 were admitted into evidence for an "admissibility" percentage of 67%. The defendant offered 86 exhibits of which 50 were admitted for an "admissibility" percentage of 58%. In terms of exhibits available for jury examination, almost twice as many plaintiffs' exhibits were admitted as defendant's.

The foregoing is significant only as it bears upon the question of a fair trial before an impartial jury. In all of the foregoing significant decisions, at least, the principal of "tie, favor the runner" benefitted the plaintiffs.

It is in the context of a "fair trial" that the Court now turns to the specific assertions of error made by plaintiffs.

---

**3.** When the parties do not question the expertise of a witness, the Court customarily states "by reason of his education and background Dr.

_____ qualifies as an expert in the field of _____. He may give opinions and he may give reasons for his opinions."

## ASSERTED ERROR # A 1

*"The Court erred by improperly bifurcating issues of liability and causation under the circumstances of this case so as to create a sterile or laboratory environment in which causation was parted from the reality of injury."*

Rule 42(b) of the Federal Rules of Civil Procedure states in part as follows: "The court, in furtherance of convenience ... may order a separate trial of any claim ..." [4] The Bendectin Litigation alone had the capability of substantially immobilizing the entire Federal Judiciary. There have been only four cases involving Bendectin which have been individually tried. They required an average of 38 trial days.[5] It takes little mathematical calculation to determine that if each of over 1100 cases were tried separately for 38 trial days a substantial number of the District Judges in this country could do nothing for a year but try Bendectin cases.[6]

The United States Court of Appeals for the Sixth Circuit has had occasion to consider this problem previously. Decisions by trial judges bifurcating under Rule 42 have been approved in *Helminski v. Ayerst Laboratories,* 766 F.2d 208 (1985); *In re Beverly Hills Fire Litigation,* 695 F.2d 207 (6th Cir.1982) *cert. denied sub nom Brian Electric Company v. Kicer,* 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983); *Koster v. 7–Up Co.,* 595 F.2d 347 (6th Cir. 1978); *Palmer v. National Cash Register,* 503 F.2d 275 (6th Cir.1974); *Crummett v. Corbin,* 475 F.2d 816 (6th Cir.1973); *Moos v. Associated Transport Inc.,* 344 F.2d 23 (6th Cir.1965).

The only admonition that may be found in any of the foregoing cases is dicta. In *In re Beverly Hills Fire Litigation,* 695 F.2d 207 (6th Cir.1982), the Court stated: "There is a danger that bifurcation may deprive plaintiffs of their legitimate right to place before the jury the circumstances and atmosphere of the entire cause of action which they have brought into the Court, replacing it with sterile or laboratory atmosphere in which causation is parted from the reality of injury. *In a litigation of lesser complexity* such consideration may well have prompted the trial judge to reject such a procedure ... Further the proofs themselves, although limited, were nevertheless fully adequate to apprise the jury of the general circumstances of the tragedy and the environment in which the fire arose...." *Id.* at 217 (emphasis added).

The experiences of time consumption that have already occurred in individual Bendectin cases lead inescapably to the conclusion that it is not just judicial economy that is involved. Under any other procedure some plaintiffs might wait years or even decades for their cases to be heard.

In *In re Beverly Hills Fire Litigation,* the United States Court of Appeals further observed: "The conclusion of the Trial Judge has support on the record. The trial on causation alone took 32 days." *Id.* at 216. In the matter at hand the trial on causation alone took 22 days.

---

**4.** Fed.R.Civ.P. 42(b) provides:

The court, in furtherance of convenience or to avoid predjudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, or of any separate issue or of any number of claims, cross-claims, or issues, always preserving inviolate the right of trial by jury as declared by the seventh Amendment to the Constitution or as given by a statute of the United States.

**5.**

| | |
|---|---|
| Mekdeci v. Merrill National Laboratories I, 77–255–ORL–Civ.–Y M.D. Fla. | 39 Trial Days |
| Mekdeci v. Merrill National Laboratories II, 77–255 ORL–Civ.–Y M.D. Fla., | 38 Trial Days |
| Oxendine v. Merrill Dow Pharmaceuticals, 1245–82 District Court for District of Columbia | 18 Trial Days |
| Cordova v. Philips-Roxane Laboratories, Inc., 43265 Superior Court of California for the County of Santa Clara | 57 Trial Days |
| | 152 Trial Days |

$$\frac{152}{4} = 38$$

**6.** If it be assumed that 230 trial days per year are available per Judge, the Bendectin cases if separately tried would require approximately

■ In an effort to avoid the "sterile or laboratory atmosphere" the Court made the following observations to the jury at the outset of trial: "The evidence in this case will indicate that this is a consolidated case; that is, the plaintiffs represent some hundreds of other plaintiffs." (T. 34).

"Let me suggest to you that what you are about to do may be one of the most important things you will ever do in your entire life. This is a significant case. It involves a lot of people. It involves not only the plaintiffs, who are individuals; it involves people, scientists, people who have done experiments, people who are employees of the defendant company. The totality of this case involves people and while you will hear technical evidence *I do point out to you that at all times you should keep in mind that on both sides there are people involved.*" (T. 59–60). (Emphasis added).

A causation trial by definition must involve scientific and technical evidence. A Court can only comply with the admonition regarding sterile or laboratory atmosphere by reminding the jury that such evidence must be considered as it relates to people.

### ASSERTED ERROR # A 2

*"The Court erred by entering judgment on the jury verdict which was merely advisory in character, based on hypothetical facts and was not the product of a true case or controversy the net effect of which was a legal nullity."*

■ A simple issue was presented to the jury. (*See* Appendix D 5050). "Does Bendectin cause birth defects?" It is difficult to understand why this is not the appropriate issue. It was severed pursuant to Rule 42(b). If plaintiffs cannot establish that Bendectin was the cause of birth defects, it matters not what else they might establish. They have failed to prove the essential element of their case. Were it otherwise the issue of causation could never be severed and the entire purpose of Rule 42(b)

would be thwarted. *See Beeck v. Aquaslide, 'N' Dive Corp.,* 562 F.2d 537 (8th Cir.1977); *In re Beverly Hills Fire Litigation,* 695 F.2d 207 (6th Cir.1982).

### ASSERTED ERROR # A 3

*"The Court erred in excluding crippled minor Plaintiffs from the courtroom in which the determination of 'causation' was determined in the abstract separate, in the part of [sic] reality from injury."*

This theme permeates plaintiffs' argument. Plaintiffs assert that the presence of crippled children in the courtroom would somehow enable the jury to render a fair and impartial verdict while their absence would not. It was freely admitted by almost every expert witness that birth defects do occur. There was statistical information, although somewhat in controversy, as to percentage, (*see infra* p. 1226) that out of a given number of live births there will be some birth defects. An accumulation of one or ten or fifty children in the courtroom, each with a birth defect, cannot without more demonstrate that such birth defects were caused by Bendectin. Rule 102 of the Federal Rules of Evidence sets forth the guiding principle of any trial: "These rules shall be construed to secure fairness in administration ... to the end that the truth may be ascertained and proceedings justly determined."

While the presence of birth defect plaintiffs should not be evidence, the rationale of Rule 403 is significant. That rule provides in part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." It is. beyond argument that in a trial of causation alone, the appearance of children with birth defects might confuse the issue or might · mislead the jury.

A trial court is always faced with the same inherent problem. Trial attorneys do not seek an impartial jury. They seek a

---

182 Judge years, i.e. 182 Judges for one entire year (1100 cases × 38 trial days = 41800 trial days divided by 230 = 181.73).

sympathetic jury. While it may be assumed that under the adversarial system the two efforts will cancel each other out and that, in fact, a fair and impartial jury will be impaneled, attempts to engender sympathy will always continue.

Because of its complexity, as above noted, the Bendectin litigation required application of Rule 42(b). Liability and damages have always been separate concepts and neither should be used to buttress the other. To use a *reductio ad absurdum* analogy, let it be assumed that identical medicine was ingested by a month-old infant and by a serial killer of 100 human beings. In each instance, the ingestion caused immediate, irreversible and total paralysis. Could it be asserted that in the *face* of liability, the killer, who is "evil" incarnate, should be denied damages because he is a bad person? Could it be asserted in the *absence* of liability, that the infant, who is the personification of innocence and "goodness," is entitled thereby to any damages?

Although the decision to bifurcate the proceedings is separate from the decision to exclude the children with visible birth defects, the two are closely related. A decision to exclude plaintiffs because of a prejudicial effect on the jury necessitates bifurcation, because although these plaintiffs may be excluded from the liability phase, exclusion from the damages phase is inappropriate. *Helminski v. Ayerst Laboratories,* 766 F.2d 208 (6th Cir.1985). In the present case, the initial issue confronted by the jury involved "liability" without respect to person. Plaintiffs have always asserted that the victims of Bendectin were children, whose birth defects were caused,

not by their parents, but by a corporate third party, the Merrell-Dow Pharmaceutical, Inc. These children are plaintiffs in this matter.

Generally, a plaintiff is present in the courtroom to testify and to confer with and assist his attorney in the presentation of his case. The United States Constitution, however, does not grant a civil litigant the absolute right to be present personally during the trial of his case. *Helminski,* 766 F.2d at 213. Even in criminal cases, the accused's right to be present is not absolute.[7]

The Sixth Circuit in *Helminski,* set out a two prong analysis to test whether the exclusion of a litigant comports with due process. First, the court must determine if the party's mere presence in the courtroom would be prejudicial, i.e. would it prevent the jury from deciding the case solely on the evidence before it. *See McDonaugh Power Equipment, Inc., v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1982). Second, if the court determines there would be prejudice, it must consider whether the party can understand the proceeding and assist counsel in any meaningful way. If the court concludes that the party can understand the proceeding and aid counsel, due process mandates that the party be permitted to attend the trial regardless of the prejudicial impact. *Helminski,* 766 F.2d at 217–18. The analysis does not end at this point, however. If on review the appeals court determines that exclusion was improper under the first prong, but that, indeed, the party could not comprehend the proceedings or aid counsel in any meaningful way, the exclusion does

---

**7.** See Fed.R.Crim.P. 43(b)(2) which provides that the defendant may be excluded from the courtroom "after being warned by the Court that disruptive conduct will cause him to be removed from the courtroom, persists in conduct which is such as to justify his being excluded from the courtroom."

The Committee Notes to the 1974 Amendment discuss the use of closed circuit television as a means to enable an excluded defendant to communicate with his attorney and keep him apprised of the progress of the trial. See also

*Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (an obstreperous criminal defendant may be bound and gagged in the courtroom or excluded from it).

A criminal defendant only has a right, regardless of his conduct, to be present at those "stages of the trial where his absence might frustrate the fairness of the proceeding." *Faretta v. California,* 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975); *accord United States v. Brown,* 571 F.2d 980, 896–87 (1978).

not constitute reversible error. *Id.* at 218, 95 S.Ct. at 2532.[8]

■ It is clear that the presence at trial during the liability phase of children suffering from severe visible birth defects is inherently prejudicial. There is no more protected and beloved member of human society than a helpless newborn infant. Conversely, it has become fashionable to castigate and punish that depersonalized segment of society identified variously as "big business," "soulless corporations," or "industrial complex." If the battle is emotional alone, between newborn infants and big business, there can be but one winner. Emotional battles, however, should not be staged in the federal courtroom. We deal in liability imposed not by emotion but by law. It is customary, in fact, to instruct juries that "[a]ll persons including corporations are entitled to a fair trial. The law is no respector of persons." (See Appendix D 5010.31)

It is equally clear that the second prong of the *Helminski* test is met. In the matter at hand, there was no testimony by children and, indeed, none was either pertinent or contemplated. In a trial of causation, the testimony, by definition, must be limited to that question. Plaintiffs do not assert, nor could they assert, that the children could meaningfully consult with counsel in the presentation of this phase of the case.[9]

During the trial, various of the plaintiffs' parents appeared in the courtroom on different days. Even those adults could not assist the presentation of the causation issue. The witnesses called by the plaintiff were well-qualified, outstanding experts in their fields. The suggestions and views of plaintiffs' parents could hardly bear upon their proposed testimony. If that be true for adults, it would verge on the frivolous to assert anything different for the children. Remarkably, plaintiffs' counsel have never claimed that the presence of even one child was necessary to assist them in their dealings with the expert witnesses.

Clearly, plaintiffs' counsel wanted deformed children in the courtroom to foster sympathy as a counterweight to the complex and frequently technical testimony of the experts. Although juror sympathy alone is insufficient to establish juror prejudice, as noted above, the mere presence of severely handicapped young children could "render the jury unable to arrive at an unbiased judgment concerning liability." *Helminski,* 766 F.2d at 217. Without question, the deformities of a specific child are highly probative in a damages trial. *See, e.g., Morley v. Superior Court of Arizona,* 131 Ariz. 85, 88, 638 P.2d 1331, 1334 (1981) (cited in 766 F.2d at 217.) Once liability is established, the deformed child would be a critical, if not the ultimate, witness in order to award adequate damages.

A fair trial contemplates fairness to both sides. In accordance with Rule 403 a trial judge must always balance probative value against prejudicial effect, confusion of the issue or misleading the jury. The probative value of a deformed child or children in the courtroom on an issue of liability alone is nonexistent. The unfair prejudicial effect of the presence of that child is beyond calculation.

### ASSERTED ERROR # A 4

*"The Court erred by allowing the Defendants to assert the defenses raised by the Lamm charts for the first time at trial in admitting the Lamm charts in violation of Rule 1006 of the Federal*

---

**8.** In *Helminski,* the Court concluded that a birth defect plaintiff was improperly excluded from the courtroom under the first prong of its test because his physical appearance was normal. However, because plaintiff was not competent to understand the proceedings or assist counsel, the Court held that his exclusion did not require reversal. *Helminski, supra* at 218.

**9.** The right of plaintiffs to view the proceedings and to communicate with counsel was preserved. A separate room near the courtroom was equipped with closed circuit television and telephone connections to Plaintiffs' Lead Counsel. For parents who wished to attend trial while leaving children in that room licensed practical nurses with experiance in dealing with handicapped children were available. (See Appendix E at pp. 5–6).

*Rules of Evidence over Plaintiffs' objections.*"

This matter was the subject of a bench conference when the issue was first raised.[10] The record of that conference demonstrates that plaintiffs recitation of the facts is incorrect. Plaintiffs had, in fact, been in possession of these charts for many months. They had been seen previously by plaintiffs' counsel at the deposition of Dr. Lamm on October 20, 1984 and at a hearing before the Court on October 31, 1984 when division of a proposed settlement by defendants to all Bendectin claimants was considered.

It is a matter of record that plaintiffs' counsel cross-examined Dr. Lamm regarding the basis of his study both at the taking of his deposition[11] and at the October 31 hearing. Dr. Lamm's deposition was filed in this Court on November 6, 1984.

At the sidebar conference, evidence was presented to the Court that plaintiffs were advised that the charts would be used. An offer was made by the court to give plaintiffs' counsel time to examine the charts if they were, in fact, unfamiliar with them. Plaintiffs' counsel declined that offer (T. 2626). The asserted violation of Rule 1006 of the Federal Rules of Evidence is somewhat unclear. The charts of Dr. Lamm do summarize the contents of his study. Rule 1006 provides in part that "such writing may be presented in the form of a chart, summary, or calculation."

█ Plaintiffs' resort to Rule 1006 may be based upon an assertion that the underlying facts were inaccurate. That is an area appropriate to cross-examination. As noted in Footnote 11 plaintiffs' counsel cross-examined Dr. Lamm exhaustively and thoroughly. Even inaccuracy does not render the charts inadmissable, it only addresses their weight and sufficiency. Dr. Goddard testified on February 26 and 27, which were the 15th and the 16th days of

---

**10.** Transcript 2624–2625

At Side Bar:

MR. EATON: Your Honor, we have searched for this chart; we show no sign of having been provided with it.

MS. ABARAY: Yes, you were.

MR. EATON: It may be an error, but if it is, I would like to know if we were provided, when.

MS. ABARAY: Before the trial started.

MR. EATON: Any cover letter or anything showing that we were provided?

MS. ABARAY: Well, I've got a letter here where I sent you the updated exhibits.

MR. EATON: May I ask the date?

MS. ABARAY: January 30, 1985. I informed you that the new demonstrative exhibits would be coming soon and that all these exhibits were based on Dr. Lamm's report and blow-ups of exhibits created by Dr. Lamm. So you've had them for months.

By subsequent letter you received the hard copy.

MR. BLEAKLEY: I've never seen them.

THE COURT: Gentlemen, I will take a half hour recess if you wish. I want it clearly understood, this exhibit is going to be displayed to the jury.

MR. EATON: That's not the problem.

THE COURT: Do you want a half hour recess?

MR. EATON: The only thing we say is we have been prejudiced, because I haven't seen it.

MR. WOODSIDE: For the record, this exhibit is in the report of the guardian ad litem of Dr.

Lamm, so that the exhibit was presented to plaintiffs' counsel by Mr. Porter prior to the time they took Dr. Lamm's deposition.

This exhibit was also referred to in the report of the guardian ad litem when we had the allocation hearing in court here several months ago, and it was resupplied to the plaintiffs along with Mrs. Abaray's letter.

So at least on three occasions they've seen it.

MR. STAMP: They also had an opportunity to examine the document with respect to Lamm.

**11.** On October 20, 1984 Dr. Steven Lamm was deposed. He was subjected to searching questioning by Mr. Eaton (pgs. 4–64); Mr. Chesley (pgs. 64–117, 160–173); and Mr. Bleakley (pgs. 117–159) Included in his testimony are the following responses to Mr. Bleakley "... there is not evidence of, if you will, statistically significant increased risk of malformation associated with Bendectin use." (p. 144)

"The result of my analyses brings me to the conclusion that within these studies the totality of the information does not indicate that persons exposed in utero to Bendectin are at greater risk statistically significant of being born with congenital malformations or with any of the major groups of congenital malformations with which we have analyzed compared to children born from pregnancies in similar populations that have not had intra-uterine exposure to Bendectin." (p. 151)

In addition the charts in question are included in such depositions as Exhibits F (8 pages) 8 and 9.

trial. Had plaintiffs sought to impeach such testimony, an additional five days of trial were available to them prior to submission to the jury.

## ASSERTED ERROR # A 5

*"The Court erred by not striking Dr. Goddard's testimony after his declaration that Plaintiffs had paid for or sponsored the Lamm charts. His statement incurably prejudiced the Plaintiffs and the net effect was not obviated by the curative instruction."*

 This assigned error is difficult to understand. Dr. Goddard was permitted to testify as an expert. He based his testimony upon information usually relied upon by experts. He was cross-examined with the disclosure that plaintiffs had paid for the Lamm charts. This is a matter of weight and sufficiency and customarily for a jury to consider. The jury was given a standard jury instruction (Appendix C # 5006) that they were not required to believe an expert witness simply because he was an expert. The expertise of Dr. Goddard was questioned by plaintiffs in the presence of the jury (*See supra* 1219–1220). The basic question of his reliability as a witness was properly left to them.

## ASSERTED ERROR # A 6

*"The Court erred by allowing defendant's counsel to be addressed as 'Doctor' and allowing Defendant's counsel to relate his medical school experience during argument."*

 Attorney Frank Woodside is in fact a medical doctor. He earned that degree from the University of Cincinnati. He is thereby entitled to be addressed in that fashion.

 Final argument has traditionally been just that—argument—an opportunity for counsel to persuade, cajole or convince jurors. Plaintiffs' counsel were not limited in any anecdotes that they told. Plaintiffs' counsel were not limited as to any experience that they might bring to the Courtroom. A defense counsel, in seeking to persuade the jury, should be given the same entitlement.

The Court notes in passing the numerous instances where plaintiffs' counsel themselves referred to defense counsel as "Doctor". (Defendant's Memorandum in Opposition to Plaintiffs' Motion for a New Trial, May 13, 1985, doc. no. 3138 at 14).

## ASSERTED ERROR # A 7

*"The Court erred in not allowing any fact testimony by Plaintiffs."*

 This assertion of error is merely a restatement of the objection to bifurcation. If causation can be separated pursuant to Rule 42(b) and submitted to the jury as the Court has done, then by definition such a question need not include fact testimony. The threshold issue of causation is not enhanced by fact testimony. Causation in a Bendectin case is a subject of great dispute. Outstanding experts on both sides reached different conclusions. It is difficult to understand even conceptually how any fact testimony by anyone would assist that determination.

## ASSERTED ERROR # 8

*"The Court erred in excluding the rebuttal testimony of Dr. Garfinkel."*

 All parties had been aware at all times that the calling of surprise witnesses is discouraged. The testimony that Dr. Garfinkel would rebut was not unanticipated, nor was there any question about its significance in the case. It dealt with the necessity for scientific studies to have a 95% degree of statistical significance. This issue has been a part of this case since 1984. At that time, the defendant raised by Motion in Limine (doc. no. 1644 May 2, 1984) an effort to prevent that argument from being made. That motion was denied in February of 1985. (Doc. no. 2862). From February of 1985 to March of 1985, the plaintiffs had four opportunities to present testimony regarding the necessity for statistical significance. Their failure to do so is hardly a basis for suggesting that a surprise witness may be called on rebut-

tal without notice to defendant until the very day at which he would appear. Such testimony, under those circumstances, would be manifestly unfair. It would deny defendant an opportunity properly to cross-examine a witness who could have testified in plaintiffs' case in chief. Each side was permitted 10 expert witnesses. (Transcript of final pretrial conference May 11, 1984 at 21–22). Plaintiffs in fact called but eight in their case in chief.

## ASSERTED ERROR # A 9

*"The Court erred in excluding Tina Schaffer's rebuttal testimony."*

██ The testimony of Tina Schaffer was not impeachment. Her proposed testimony would be that Dr. Peter Dignan, a defendant expert, had once told her that Bendectin could not be ruled out as a cause of birth defects because one cannot prove a negative.

In fact, Dr. Dignan so testified. The following appears in the transcript at page 3156: "We cannot absolutely discard it. We cannot prove a negative." It is likewise a matter of record that Dr. Dignan was asked on cross-examination whether he had made such a statement and he admitted doing so. (T. 3156). There can be no impeachment where a witness has agreed that he made the statement the impeaching witness would testify to.

## ASSERTED ERROR # 10

*"The Court erred in not allowing Plaintiffs' counsel to test the knowledge of Defendant's experts to see if they knew that some of the safety data on Bendectin was fraudulent."*

Plaintiffs' counsel asserted with quite some frequency that the Bunde-Bowles study was seriously flawed. It may have been. In no instance however was plaintiffs' counsel denied an opportunity to inquire into the Bunde-Bowles study when a defendant's expert relied upon it.

██ Where a defendant's expert did not rely upon that study, any effort to introduce its flaws or defects would be irrelevant and could only have been prejudicial

to the defendant. Under those circumstances cross-examination was prohibited. (*See, e.g.,* T. 2493–2501) For a complete discussion of plaintiffs' attempts to discredit the Bunde-Bowles study, see *infra* pages 1229–1230.

## ASSERTED ERROR # A 11

*"The Court erred in refusing to allow Plaintiffs' counsel to cross-examine Defendant's expert witnesses using learned treatises to the extent permitted under Rule 803(18) F.R.E."*

The Court's ability to respond to this asserted error is severely handicapped by counsel's failure to make reference to the trial transcript. It is difficult if not impossible to search over 3700 pages of transcript in an effort to supply instances of alleged error.

The Court is aware of two instances. During the testimony of Dr. Bryan Hall, the Court ruled that plaintiffs could cross-examine on plaintiffs' Exhibit no. 3300 regarding the mutagenicity of Decapryn, if the witness admitted that it was authoritative or if it was authenticated as authoritative by a prior witness. Neither condition was met, so cross-examination was not allowed. (T. 2892–98). When Dr. Lewis Holmes admitted to having reviewed the article, cross-examination was permitted. (T. 3086–89).

Plaintiffs counsel were given full opportunity for cross-examination. Seventeen hours and forty-five minutes were expended in the cross-examination of defendant's nine expert witnesses. In the absence of specific references by plaintiff's counsel this asserted error is denied.

## ASSERTED ERROR # 12

*"The Court erred in permitting Defendant's counsel to argue based upon alleged conversations between himself and co-counsel regarding the Lamm charts."*

The matter of the Lamm charts has been carefully considered herein (*supra* pp. 1226–1229). The uncontroverted evidence indicates that plaintiffs' counsel were aware of the Lamm charts, conducted extensive

cross examination of Dr. Lamm as to the basis of his opinion and were given ample opportunity to interrogate Dr. Goddard regarding his use of the charts. Plaintiffs had the opportunity either to call a rebuttal witness or to read from their cross-examination of Dr. Lamm. They elected to do neither. It serves little purpose to repeat the analysis the Court has already made. This asserted assignment of error is denied.

## ASSERTED ERROR # 13

*"The Court utilized the incorrect burden of proof of proximate cause when violations of the Food, Drug and Cosmetic Act are alleged."*

This asserted error, even if correct, is totally irrelevant to the issue presented to the jury. The Court has discussed previously its exclusion from the record of the FDA approval of the drug (*supra* p. 1220) and repeats once again that the issue presented to the jury in this case is as follows: "Have the plaintiffs established by a preponderance of the evidence that ingestion of Bendectin at therapeutic doses during the period of fetal organogenisis is a proximate cause of human birth defects (Appendix C–5750). If this asserted error seeks to raise the question of a definition of proximate cause it is the Court's position that proximate cause was defined in accordance with controlling Ohio law (Appendix C–5730). This assertion of error is hereby denied."

## ASSERTED ERROR # B 1

*"The Court erred in not allowing the individual Plaintiffs to adduce evidence of the time of ingestion, injuries suffered, genetic history, history of, or absence of history of ingestion of other drugs during the critical period of pregnancy or the absence of other possible causes of the Plaintiffs birth defects."*

The Court is unaware that this issue was raised at trial. Plaintiffs have not provided a citation to the trial transcript supporting their allegation. There was an objection made at the Final Pretrial Conference (*see* doc. no. 1814), where the Court limited the witnesses to be presented at trial to expert witnesses. Plaintiffs did not express such a concern over not being permitted to call any of the 613 plaintiffs identified in the witness list attached to the Final Pretrial Conference Order (doc. no. 1672 at 22–33.) No objection was made to the preclusion of individual plaintiffs' testimony in the March 19, 1984 Status Conference, although the subject was discussed. (Doc. no. 1504 at 33–35).

As late as January 18, 1985, the plaintiffs stated in a memorandum that "[they] do not dispute the format of this trial nor do they dispute that the respective parties during their case in chief, will be limited to the use of expert witness [sic]." (Doc. no. 2468 at 2).

■ Nevertheless, the Court will briefly describe the rationale for its decision to exclude testimony and evidence pertaining to the individual plaintiffs. Initially it is noted that evidence of the dates when the over 800 plaintiffs ingested Bendectin was unnecessary and irrelevant in the first phase of the trial because the jury was instructed, without objection from the plaintiffs, to assume that Bendectin was ingested at therapeutic doses during the period of fetal organogenesis. (Appendix C–5730). Indeed, the plaintiffs submitted the following jury instruction to the Court: "For purposes of determining the issues before you, you are to assume that the mothers in this litigation who ingested Bendectin during pregnancy, took Bendectin in therapeutic amounts, as prescribed by their respective physicians and were not exposed to other substances which may cause birth defects." (Doc. no. 2981). Evidence and testimony concerning the injuries suffered, the genetic history of, and the drug history of the plaintiffs listed in the Final Pretrial Conference Order (doc. no. 1672) are not relevant because they do not tend to make the fact of consequence in the causation phase of the trial more or less probable. The mere fact that one or several or a thousand plaintiffs ingested Bendectin and, nine months later, gave birth to a malformed child is simply a temporal associa-

tion. Temporal associations do not establish causation. Accepting for illustrative purposes the figure of 30 million pregnant women who have taken Bendectin during pregnancy and further assuming a background birth defect rate of 2 to 5%, one would expect 600,000 to 1,500,000 children to be born malformed due to chance (i.e., a cause other then Bendectin). In view of these facts, a single incident of a malformed child produced by a woman who had ingested Bendectin does not support a cause and effect relationship but is, rather, conjecture which contributes nothing meaningful to the determination of the issue at hand. *Hasler v. United States,* 718 F.2d 202, 205–06 (6th Cir.1983). The demonstration of a temporal relationship, not being probative of causation, renders the testimony concerning the individual plaintiffs irrelevant and inadmissible. Fed.R.Evid. 401, 402. *See Hupp v. United States,* 563 F.Supp. 25, 30 (S.D.Ohio 1982).

Even if such evidence were viewed as relevant, the low probative value of the testimony of the individual plaintiffs is substantially outweighed by the danger of confusion of the issues, risk of unfair prejudice, and considerations of undue delay and waste of time. *See* Fed.R.Evid. 403. The unfair prejudice exists in permitting a number of plaintiffs to testify or submit evidence, thereby potentially inducing a decision of the jury on an emotional basis. *See Carter v. Hewitt,* 617 F.2d 961, 972 (3rd Cir.1980). Additionally, the admission of such evidence would have confused the jury in that they inevitably would have focused their attention on the specific details of the individual plaintiffs who had testified rather than concentrating on the central issue of causation. To allow evidence and testimony concerning all plaintiffs or even a portion thereof would have unquestionably resulted in a substantial delay in an already lengthy trial on issues that were collateral to the central issue in the first phase. *See Stengel v. Belcher,* 522 F.2d 438, 442 (6th Cir.1975). Testimony pertaining to the individual plaintiffs was not totally barred—it was only held inappropriate to the causation issue. Had

plaintiffs prevailed on causation such testimony would have been probative and essential. The Court concludes that the Rule 403 balance should be struck in favor of excluding evidence of individual plaintiffs' medical histories.

## ASSERTED ERROR # B 2

*"The Court erred in excluding evidence of fraud by Merrell in the conduct of animal and human tests with Bendectin and more specifically, evidence that the Bunde-Bowles study was fraudulent, and that Merrell falsely reported the results of the animal tests."*

The allegation of the plaintiffs is not completely accurate. The fact is that there was evidence admitted at trial which developed in detail the deficiencies of the Bunde-Bowles study. Such evidence consisted of the following trial testimony:

1. The co-author of the Bunde-Bowles study, Dr. Bunde, was a member of the Department of Medical Research at the Merrell Company (T. 397). Dr. Bowles was also associated with the defendant (T. 1958).

2. The study was "poorly designed" and "one really designed not to be likely to provide very useful information." (T. 400).

3. Other shortcomings included: the sample size was too small (T. 400–401); the matching of the exposed sample to the control was improperly done (T. 401); the method of determining whether a mother did, in fact, take Bendectin "was not a very thorough one," (T. 401); the records relied upon to indicate the presence of malformations may not have been dependable (T. 401–402); the data in the study demonstrating a lower incidence of malformations in the control group as opposed to the exposed group makes the data "suspect" (T. 406); the data suggest a form of preselection (indicative of a lack of a representative sample) (T. 407).

4. Dr. Done performed his own analysis of the raw data generated by the Bunde-Bowles study and discussed his analysis

at length (T. 408–435). There were problems in the data collection phase of the Bunde-Bowles study (T. 413), such as the same patient being classified as a member of both the control group and the Bendectin-exposed group (T. 413); quite a few births were not found recorded in the birth registry records obtained from the hospital (T. 415); there were thirty-six instances in which patients were reported to have taken Bendectin in the study but there were no records indicating that they had, in fact, been provided Bendectin (T. 415).

5. When asked if he had an opinion as to whether the Bunde-Bowles study was "reliable in proving the causation of Bendectin" (T. 446), Dr. Done testified "[t]hat from the scientific standpoint, the study is totally worthless." (*Id.*).

6. Dr. Done then discussed rat and rabbit studies performed by Merrell with Bendectin and its chemical components (T. 446). He criticized the studies for failing to select the appropriate doses of the drug administered to the animals in order to delineate a potential dose-response relationship (T. 458).

7. Dr. McMahon accorded "little weight" to the Bunde-Bowles study (T. 2073). He further characterized the study as "very weak" because the questionable methodology used resulted in an underassessment of the number of malformations which occurred (T. 2077–79).

8. Dr. Newberne discussed a 1962–63 rabbit teratology study conducted by the defendant (T. 2467). He relied on the study only "to a small extent." (*Id.*). The deficiencies in the study, such as the small number of rabbits used and the fact that there was below-zero weather during the experiment were discussed, with Dr. Newberne concluding the study "had very little relevance." (*Id.*). The Court admitted the animal study into evidence (T. 3465). He further testified that, in his capacity as Director of Safety at Merrell, he did not rely upon the findings of the Bunde-Bowles study (T. 2500).

9. Dr. Holmes did not consider the Bunde-Bowles study "helpful." (T. 3059–60).

▪ The plaintiffs have cited to no pretrial ruling specifically excluding evidence that the Bunde-Bowles or any other study was fraudulent. The Court did limit the first phase of the trial to causation, deferring issues of negligence and fraud until a later stage. (Doc. no. 1504 at 28). To the extent that the plaintiffs' alleged trial error results from that point, Federal Rules of Evidence 401 and 403 were the grounds for excluding such evidence from the causation phase of the trial. (*See* supra pp. 1221–22). To the extent that the plaintiff's assertion of trial error is premised on the Court's exclusion of fact witnesses in the first phase of the trial, the basis for that ruling is discussed in detail below (*see supra* pp. 1221–22, 1226–27) and need not be duplicated here. The alleged error is unsupported by the evidence.

### ASSERTED ERRORS # B 3 & 4

*"The Court erred by failing to allow evidence that drugs chemically related to Doxylamine contained pregnancy warnings and were contraindicated in premature infants" and "in excluding evidence that Unisom, a brand of Doxylamine, sold by other manufacturers contained pregnancy warnings and was contraindicated in premature infants."*

At trial, the plaintiffs did not dispute the fact that their proffered exhibits 3188, 3189, and 3190 had not been disclosed to the defendants until they were offered into evidence during Dr. Thoman's testimony. Such conduct violated this Court's Rule II.B, which mandates the disclosure of all documents "expected to be used at trial" to the opposing counsel prior to the Final Pretrial Conference. This factor alone would have been sufficient grounds to prohibit the plaintiffs from introducing the three exhibits into evidence, *see* Fed.R. Civ.P. 16, 37(b)(2)(B), as was noted by this Court at trial (T. 1676).

Additionally, the merits of the offered exhibits containing the labels for Pyriben-

zamine, Benadryl, and Unisom were reviewed at trial. The threshold requirement of relevancy simply was not met. The fact that warnings were placed on these three over-the-counter (nonprescription) drugs by manufacturers other than the defendant did not make the existence of a fact of consequence more or less probable. While the fact that a warning was placed by a third party on a nonprescription drug is conceivably relevant to a subsequent issue of notice or negligence, it is not germane to the single issue of whether Bendectin causes birth defects.

The exhibits were later resubmitted at trial in the form of excerpts from the *Physicians' Desk Reference* (5th ed. 1984) ("PDR"). Again it was argued that the warnings and contraindications contained in the PDR for each of the three drugs were "probative because the drug companies are experts," citing *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831 (1981), and *Tomer v. American Home Products Corp.*, 170 Conn. 681, 368 A.2d 35, 40 (1976), (T. 1681–82).

The plaintiffs' argument is defective factually and logically. The contraindications and warnings on these drugs are ambiguous, at best, when attempting to infer the purpose for which the warnings were designed. A "contraindication" does not attempt to establish or report a cause and effect relationship. Rather, it deals with the general clinical advisability of a particular drug therapy being used to treat a disease or condition. Schmidt's Attorney's Dictionary of Medicine (J. Schmidt ed. 1985); Stedman's Medical Dictionary (W. Dornette 5th ed. 1982).

Contrast such proffered evidence with studies demonstrating the teratogenicity of the three drugs. Here, rather than introducing scientific or medical evidence on the teratogenicity of Unisom or of chemical compounds allegedly similar to Bendectin in order to make the fact of consequence in this case, i.e. Bendectin's teratogenicity, more or less probable, the plaintiffs seek to derive that inference from a warning placed on a nonprescription drug by third

parties as such parties were required by law to do.

Without delving into a lengthy discussion on the legal background of over-the-counter drug warning requirements, the Court observes that the *Seley* and *Tomer* cases cited by the plaintiffs to support their position actually weigh heavily against them. Those cases exemplify the significant differences between the law on drug warnings and the principles of causation. The *Seley* Court stated that "[a] jury may find that a warning is inadequate and unreasonable even where the existence of a risk, i.e., a causal relationship between the user of the product and resulting injury, has not been definitely established.... Thus, where scientific or medical evidence exists tending to show that a certain danger is associated with the use of the drug, the manufacturer may not ignore or discount that information in drafting its warning solely because it finds it to be unconvincing.... [A] warning is adequate for Comment K purposes where, under all the circumstances, it reasonably discloses to the medical profession all risks inherent in the use of drug which the manufacturer knew or should have known to exist." *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 198, 423 N.E.2d 831, 836–37 (1981) (citations omitted).

A reading of the *Tomer* case, the second case cited by the plaintiffs, reveals that the manufacturer is obligated to warn in cases where the drug may affect only a small number of idiosyncratic or hypersensitive users. *Tomer v. American Home Products Corp.*, 170 Conn. 681, 368 A.2d 35, 40 (1976). Given this background, it is clear that the mere fact that a drug has a general warning or contraindication against its use in pregnancy is not probative of the drug's teratogenic effect.

When requested to bolster their position on the Unisom PDR with evidence that the drug causes birth defects, the plaintiffs simply pointed to the warning against giving Unisom to a nursing child. (T. 3299–3300). Again, the contraindications listed for Unisom against asthma, glaucoma, en-

larged prostrate glands, and pregnancy were too vague and ambiguous to be probative of any teratogenic effect of the drug. (*See* Pltfs.'s Exh. 3190,3332). In fact, the plaintiffs did not dispute the argument of the defendant that Unisom was labeled with a warning because of anticipated regulations rather than because of any concern about the potential teratogenicity of the drug. (T. 3298, 3529–30). Furthermore, the statements contained in the PDRs for Pyribenzamine and Benadryl were not probative of their teratogenic effect. (Pltfs.'s Exh. 3188: "Although no Pyribenzamine-related teratogenic potential or other adverse effects on the fetus have been observed in limited animal reproduction studies. . . ."); (Pltfs.'s Exh. 3189: "Experience with this drug in pregnant women is inadequate to determine whether there exists a potential for harm to the developing fetus").

██ In sum, the three exhibits are not relevant. The warnings are out-of-court statements offered to prove the truth of the matters asserted. Even when resubmitted in PDR form, the warnings do not fall within the learned treatise exception of Federal Rule of Evidence 803(18) nor the commercial publications exception of Rule 803(17). The warnings are in fact inadmissible hearsay. Even if viewed as relevant under Rule 401, the low probative value of such evidence is substantially outweighed by the danger of confusing and misleading the jury and by the delay which would result from litigating these collateral issues. Fed.R.Evid. 403.

The plaintiffs also offered the exhibits through the testimony of Dr. Thoman. Rule 703 provides that if the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Fed.R.Evid. 703.

Even assuming that the three exhibits are of the type reasonably relied upon by experts to form an opinion on whether Bendectin is a teratogen, Rule 703 is subject to a Rule 403 analysis. Under Rule 403, the testimony concerning the exhibits is barred because the minimal probative value of the warnings is substantially outweighed by considerations of undue delay arising from the collateral issues. (*See* T. 1683, 3299–3304). If the exhibits would have been discussed by Dr. Thoman or admitted into evidence, an estimated day and a half would have been spent on the question of why the warnings were placed on the drugs. (T. 3529–30). Additional testimony would have been offered on: the issue of the FDA's not requiring a warning on doxylamine succinate (T. 3534); that the FDA's basis for its decision not to require a warning on doxylamine succinate was allegedly premised on deficient studies conducted by the defendant (T. 3534–35); and that the FDA did, in fact, approve Bendectin (T. 3536). This latter point in particular may have had the effect of intimidating or misleading the jury into believing that Bendectin was not teratogenic since the scientists at the FDA approved the sale of Bendectin. *See Minichello v. U.S. Industries, Inc.*, 756 F.2d 26, 30 (6th Cir.1985). It is precisely this issue of FDA approval that plaintiffs successfully excluded from the jury's consideration. (*See supra* p. 1220). Accordingly, the plaintiffs' allegations of error on these points are denied.

### ASSERTED ERRORS #B 5, 6, 7, & 8

*"The Court erred by refusing to admit spontaneous adverse drug reaction reports demonstrating a pattern of birth defects while allowing Drs. Hall, McClain and Dignan to give anecdotical and testimonial descriptions of their clinical experiences with Bendectin which could not be verified by Plaintiffs"* [B–5]; *"in allowing Drs. Hall, McClain and Dignan to testify concerning the number of birth defects among exposed patients in their clinical practice while excluding adverse drug reaction reports demonstrating birth defects among exposed persons reporting"* [B–6]; *"in denying the Plaintiff's the opportunity to question Dr. McClain concerning his knowledge of ad-*

*verse drug reaction reports"* [B–7];[12] and, *"in allowing Drs. Hall, McClain and Dignan to testify concerning specific conclusions from their clinical practice inasmuch as patient records and subpoena data were not subject to cross-examination."* [B–8]

The plaintiffs are in error in stating that the Court refused to admit drug experience reports ("DERs") into evidence. At trial, the plaintiffs moved to admit 1,200 Bendectin DERs into evidence. (T. 467). The Court deferred its ruling on admissibility at that time while allowing Dr. Done to testify regarding DERs pursuant to Federal Rule of Evidence 703. Throughout the trial the Court clearly explained and reiterated its position on the DERs:

> "The Court: Again, Mr. Eaton, I want the record clearly to reflect, I'm not saying that adverse drug experience reports are inadmissible. I have said, instead, that I will follow the procedure outlined by Judge Johnson [United States District Judge in Koller v. Richardson-Merrell, Inc., no. 80–1258 District, D.C.], which is a reported decision, and at the appropriate time I will hear counsel as to whether or not selected drug experience reports may be admitted. I'm not holding that they are inadmissible in toto.
>
> "Mr. Eaton: We understand that."

(T. 1875; *see* T. 1665, 3463). Notably, Plaintiffs' Exhibit 2113, a summary of 96 DERs, was admitted into evidence. (T. 501–03; 3527).

A number of plaintiffs' experts provided testimony evaluating the DERs. Dr. Done stated that his review and analyses of the DERs resulted in his concluding that a pattern of limb defects existed in the children born to mothers who ingested Bendectin. (T. 495–04). Dr. Melnick also based his opinion in part on the compilation of 221 Bendectin DERs that he reviewed. (T. 1383).

Several of the plaintiffs' experts testified at some length on a small number of DERs. After stating that his opinion was based in part on the DERs, Dr. Thiersch discussed two DERs in detail. (T. 1785–96, 1798, 1801). Dr. Thoman discussed two DERs which described a fatal incident of a three-year-old child who ingested 20 Bendectin pills and another occasion where a year-and-a-half-old child ingested 15 pills. (T. 1668–70). Dr. Swann testified concerning a series of five DERs summarizing genitourinary malformations in children exposed to doxylamine succinate. (T. 958, 1009). Dr. McBride testified about a mother who had ingested Bendectin and gave birth to twins, one containing reduction deformities and the other without. From a review of the record, it is clear that both the DERs themselves as well as testimony referring to the DERs were permitted.

The plaintiffs' assertion that the statements of Drs. Hall, Dignan, and McClain pertaining to their clinical experiences with Bendectin could not be verified warrants little discussion. First, the plaintiffs made no objection at trial on this basis nor did they request a recess to review any materials they felt were necessary to cross-examine the witnesses. Second, an opportunity to "verify" the clinical experiences of the defendant's experts with Bendectin certainly was provided during the deposition of and cross-examination of each witness. *See* Fed.R.Civ.P. 26(b)(4); Fed.R.Evid. 705.

It is unclear from the plaintiffs' motion what anecdotical and testimonial statements should have been excluded. There is no record that the plaintiffs objected during the testimony of Drs. Hall, McClain, and Dignan on such a basis. (*See, e.g.,* T. 2871, 3174). In fact, Dr. Dignan did not illustrate his testimony concerning his clinical experience with any examples even though the plaintiffs themselves wished to elicit such statements. (T. 3133–34).

Although Drs. McClain and Hall did discuss the existence of birth defects among the children of their patients, the plaintiffs' expert, Dr. McBride, had previously been accorded the same opportunity when he

---

**12.** The plaintiffs have not cited a reference to the trial transcript to support this allegation of error nor has the Court located the alleged incident in its review of the transcript.

discussed the results of a questionnaire he sent to the Child Amputee's Association (T. 786–88). In fact, the plaintiffs specifically questioned Dr. McClain about the birth defects he had seen in his practice. (T. 3193, 3199–3201).

■ Testimony concerning the clinical experiences of the expert witnesses fell within Federal Rule of Evidence 703, in that their experiences formed a basis for their opinions. Dr. Thiersch, a plaintiffs' expert witness, acknowledged this point when he stated that clinical experience has been valuable in the past in determining whether a particular drug is a teratogen. (T. 1787). The Court also notes that the plaintiffs had every opportunity during cross-examination, and indeed exercised that opportunity (see, e.g., T. 2966), to identify and emphasize the limitations of an expert opinion based on clinical experience.

Finally, the plaintiffs allege that they were denied the opportunity to question Dr. McClain concerning his knowledge of DERs. The Court has carefully reviewed the transcript (T. 3188–22) and can find nothing to substantiate the allegation of error. Therefore, the Court concludes that the plaintiffs' four contentions of trial error are groundless.

### ASSERTED ERROR # B 9

*"The Court erred in excluding evidence and argument that genetically susceptible individuals can have an exaggerated response to therapeutic doses of drugs."*

Once again, the plaintiffs' statement is inaccurate. An examination of the evidence introduced at trial on this subject may be summarized as follows. Dr. McBride stated that "[i]t's possible that some humans are more susceptible to drugs which are teratogenic because of their genetic makeup." (T. 839). He also agreed that there is a different "susceptibility not only between different species, but also possibly between different members of the same species." (*Id.*). He further testified that the theory that different genetic backgrounds respond differently to different drug dosages is "possible but not proven at this stage." (T. 852). Dr.

McBride finally noted that some people are very sensitive to many drugs and may have an exaggerated response. (T. 852–53).

Dr. Scott defined Karnofsky's Law as providing that "any drug or chemical can be made to be teratogenic if it's given in the appropriate amount to the appropriate species at the appropriate time of pregnancy." (T. 2292). He further agreed that it is "a fact that in the same species you may find wide differences in response to people given the same amount of a drug." (*Id.*).

Dr. Melnick confirmed that it was impossible for him to formulate an opinion with respect to genetic susceptibility to Bendectin's causing birth defects because scientific studies have not been performed to address that question. (T. 1444).

Dr. Bracken agreed that, with respect to a teratogenic effect, different individuals have different susceptibilities. (T. 2818). He agreed that the statement " 'one man's meat is another man's poison' would [relate to a] genetic susceptibility to a given substance." (T. 2818). Because it is the interaction of the teratogen with the genetic makeup of a given child which may result in a congenital malformation, not all children of mothers who ingest a teratogenic drug develop birth defects. (*Id.*). He also testified that the susceptibility of a given child with respect to a defect or a specific series of defects varies with the time of exposure. (*Id.*). Dr. Bracken finally stated that he did not believe that there were any studies that have specifically demonstrated a genetic susceptibility to Bendectin. (T. 2839–40).

When asked if he agreed with Karnofsky's Law, Dr. Hall testified that he did not "know that we know that. [When] [a]ny substance [is administered] in large amounts, or in a particularly susceptible individual who differs from the general population, that Law might apply." (T. 2890). Dr. Hall reported that there has been no study or data showing that any person is susceptible to developing birth defects as a result of exposure to Bendectin. (T. 3001). There has been no demon-

stration of a synergistic relationship between Bendectin and any other drug which would produce birth defects in humans that Dr. Hall was aware of. (T. 3002).

Dr. Dignan stated that he was familiar with Dr. Wilson's conclusions that environmental factors and genetics act in concert or may act in concert in a particular case to produce a birth defect. (T. 3131–32). He further testified that he does not know of a genetic susceptibility to the development of birth defects as a result of exposure to Bendectin. (T. 3126). He did agree with the general proposition that genetics and the environment may play a concurrent role resulting in birth defects. (T. 3127). Dr. Dignan did not know of any scientific articles indicating that the general proposition is inapplicable to Bendectin. (*Id.*).

During the jury charge conference, the Court stated that it would not exclude argument on that subject but stated that if plaintiffs argued that a genetic susceptibility to Bendectin exists a proposed Courts instruction would be given.[13] The plaintiffs instead argued the general potential for an individual's exaggerated response to a drug (T. 3544–48), and thereby avoided triggering the proposed jury instruction. (T. 3548–50).

In contrast to the plaintiffs' assertion, the simple fact that argument was not foreclosed on the genetic susceptibility theory is revealed by Mr. Bleakley's and Mr. Eaton's closing statements:

[Mr. Bleakley:]

... I think a few basic principles of teratology are in order to discuss initially.

One, it's important for to [sic] you understand that there are individual susceptibilities to the effects of a drug or a teratogen. Individual susceptibilities means that not all children who are exposed to Bendectin wind up with birth defects. There is no claim made to that effect, and we disavow any type of insin-

uation or inference that that's what this lawsuit is all about.

It was customary in a marine bootcamp down in the southern region, relatively few years back, to put the boot people, bootcamp people through extended marches. One hundred marines marched ten miles in one hundred degree temperature. Two marines died. Not all one hundred died; only two. Ninety-eight survived. But it was clear that the individual's susceptibility to heat, the individual's susceptibility to the fatigue and the exhaustion allowed two people to die.

That is an example of why not all children that are exposed to Bendectin develop birth defects. Individual susceptibility is an important thing to keep in mind.

Another aspect of teratogenicity or the law of teratogenicity is that exposures at different times can result in different malformations.

There is no teratogen on earth that causes the exact malformation time and time and time again.

We have heard, and I'll read from Dr. Bracken's study....

A little footnote at the bottom of page 923, "Heart valves, limb buds and pyloris [sic] all develop around the sixth to eighth week of gestation."

What that means is that any time during that critical period of exposure, any one or more of the organ systems that are involved can be affected. That accounts for the variability, that accounts for the variability of the expression of a given teratogen on the human beings.

What is the evidence in humans? We have evidence of toxicity.

You recall the two tragic children that accidentally ingested rather substantial amounts of Bendectin. One child approximately two years old ingested twenty tablets and died.

---

**13.** The proposed instruction of the Court provided that "I instruct you that there has been no evidence presented to prove that human beings have a genetic susceptibility to Bendectin which causes birth defects." (T. 3545).

What does this mean? This is a clue to the individual susceptibility of these children to the effects of the antihistamine Doxylamine.

I had Dr. Bracken calculate for the one thousand milligram exposure what the milligram per kilogram dosage was. It broke down to approximately seventy-three milligrams per kilogram. It's important to keep that figure in mind when particularly you contrast the extremely high doses, eight hundred milligrams per kilogram, that the rat is able to tolerate in the Research Triangle Institute study. That emphasizes the variability of species, but it also emphasizes the extreme susceptibility of the human child to the effects of antihistamines, particularly to Doxylamine Succinate.

(T. 3574–76).

[Mr. Eaton:]

Additionally you heard testimony, it's uncontroverted again by Merrell's own witnesses, that different people will have an exaggerated response to a drug.

All you can do is use your own experience, your good conscious, your common sense and to say that if a drug is clastogenetic [sic], if a drug is an antihistamine, if a drug is associated with increased risk in birth defects, if a drug is shown to be dangerous to the embryo, if a drug is a teratogen, if a woman can react or have an exaggerated response to a therapeutic amount, it is for your to decide. The evidence is there.

(T. 3615–16, 3712).

On the basis of the foregoing record, the Court concludes that the plaintiffs' contentions of error are unfounded.

**ASSERTED ERROR # B 10**

*"The Court erred in excluding at trial relevant evidence about a known teratogen, Thalidomide, which would have shown that Merrell deliberately misinter-preted animal test results and chose dose levels for Bendectin tests that would not show a teratogenic response and that rats were resistant to teratogens while allowing Merrell's witnesses to rely on the misinterpreted test results which were false."* [14]

At the outset, the Court notes that there was evidence admitted supporting the proposition that rats may be resistant to teratogens. For example, Dr. Melnick testified that "I would not be terribly concerned by the large doses [of a drug administered to a rat during a study], given what we know about the resistance of the rat, even to the most devastating teratogen known to man." (T. 1305–06).

During the examination of their witness, Dr. Newman, the plaintiffs proposed to read the following sentence from the Defendant's Exhibit 1656A, a study authored by M. Guntakatta, E. Matthews, and J. Russell, of Litton Bionetics, Inc.:

"In relation to present studies, in relation to these present studies, this type of system, Thalidomide, did not induce differential inhibition...." [15]

(T. 321). The plaintiffs stated that, when the specific *in vitro* scientific procedure was applied to both Bendectin and Thalidomide, neither drug was found to be teratogenic. (T. 323). They argued that this was probative of the test's credibility. The Court applied a Rule 403 balancing analysis and determined that the probative value of the evidence was substantially outweighed by the unfair prejudice to the defendant.

The plaintiffs, however, were not prejudiced by this ruling. They were permitted to pursue the line of interrogation as long as no explicit reference to "Thalidomide" was made. Subsequently, the plaintiffs asked Dr. Newman if the study (def.'s exh. 1656A) indicated that among those

**14.** See *infra* pp. 1241, 1241–42 for further discussion of the Court's ruling on Thalidomide evidence.

**15.** The sentence the plaintiffs attempted to read, as taken from Defendant's Exhibit 1656 A at 363, provides: "In relation to the present stud-ies, Thalidomide did not induce differential inhibition of $^3$H-thymidine or of $^{35}$SO$_4$= incorporation into mouse limb bud cell cultures (data not shown) and this may have been a result of the inability of the cultured mouse cells to biotransform this drug to an active intermediate."

compounds tested, there were compounds which, though known teratogens, were not detected as teratogenic when subjected to that particular scientific procedure. (T. 326–27). He answered affirmatively and continued to explain that the compounds tested were "very powerful substances, maybe the most powerful teratogen known to man." (T. 327).

The next incident involving Thalidomide arose as follows. Dr. Newberne, an employee of Merrell, was explaining during direct examination his reasons for relying in part on studies performed by Dr. Larson when the plaintiffs objected. (T. 2360). Dr. Newberne had opined that Dr. Larson's rat studies were innovative and state-of-the-art for the 1960s. (T. 2359). The plaintiffs argued that Thalidomide was the reason the rat studies were initiated and they objected to not being able to refer to that. (T. 2360). Dr. Newberne, as an expert witness, was permitted to explain the basis for his reliance upon certain studies. *See* Fed.R.Evid. 703. In response to the plaintiffs attempt to introduce such evidence, the Court also concluded that the reason why the studies were commenced was irrelevant. The reason a study was initiated did not make a fact of consequence in the causation phase of the trial more or less probable. (T. 2361–62). *See* Fed.R.Evid. 401. Furthermore, the Thalidomide evidence was unduly and irreparably prejudicial. Fed.R.Evid. 403.

During the direct examination of the defendant's expert, Dr. Newberne, the plaintiffs argued at sidebar that they should be allowed to use a 1962 article published by Holtkamp and Staples. (T. 2368–70). They reasoned that the 1962 article reflected Staples's finding that shifted ossification centers were indicative of malformations induced by Thalidomide, which stood in contrast to Dr. Newberne's conclusion that shifted ossification centers were normal variations and not drug induced. (T. 2370).

The introduction of evidence concerning the interpretation of Thalidomide tests in animals presents an opportunity for unfair prejudice to the defendant that would be irreparable and that outweighs its slight, if any, probative value. Fed.R.Evid. 403. Again, the plaintiffs were not precluded from developing the apparent inconsistencies in the interpretation of data between Drs. Staples and Newberne. During the cross-examination of Dr. Newberne, he was questioned about Dr. Staples's conclusion that the ossification changes in animals resulting from administration of Bendectin were significant (T. 2475) and about the fact that Dr. Newberne's opinion differed from that of Dr. Staples's and Dr. Holtkamp's (T. 2476). The Court finds this allegation of error unsupportable.

## ASSERTED ERROR # B 11

*"The Court erred in excluding evidence that the Smithells study, relied on by Defendant's witnesses, was prepared by a biased investigator who prepared it with a view towards helping Merrell in litigation."*

A brief excerpt from the direct-examination testimony of Dr. Swan which immediately preceded the plaintiffs' attempt to offer Exhibit 3137 is informative:

[Dr. Swan:]

... The problem of bias is quite different from this concept of sample size. It's a question of being on the mark.

....

An example in terms of weight is that you always weigh yourself on a scale that's five pounds off. If you did that, you would—you did that for a year, you would have very precise measurements in the sense that they would be close together, but, they could be all off. That's bias. Your average would be biased by five pounds.

(T. 888–89).

The exhibit that the plaintiffs claim was wrongly excluded is a letter from Dr. Smithells, a university professor, to Dr. Hoekenga, a Merrell employee, dated January 26, 1977. (Pltfs.'s Exh. 3137). It discusses both the publication efforts made concerning a paper that Dr. Smithells was hired by Merrell to write and the financial support Dr. Smithells was soliciting from Merrell

for university research assistantships. The plaintiffs wanted the exhibit admitted to show that Dr. Smithells was not an impartial clinical investigator (T. 890, 892). In particular, the exhibit was offered to show that Dr. Smithells was biased in his research as evidenced by these statements contained in his letter:

> "Much [the extent of financial aid Merrell could provide] clearly depends on the value of this publication to Merrell-National labs. If it may save the company large sums in California Courts, (which is rather why I thought when we undertook the study) they may feel magnanimous."

(Pltfs.'s Exh. 3137).

At trial, the Court noted that Dr. Swan had been testifying about the definition of statistical bias as opposed to legal bias. The statistical bias which Dr. Swan was making reference to is defined as a tendency of an estimate to deviate in one direction from a true value. In contrast, legal bias is defined as a predilection with a point of view such that one does not respond impartially to anything related to that point of view. *See* Black's Law Dictionary 147 (5th ed. 1979).

 It is obvious from a reading of the context in which the exhibit was offered that the exhibit unquestionably bore no relevance whatsoever to the subject of statistical bias about which Dr. Swan had been testifying. There is no conceivable way that a letter which exemplifies [16] a type of legal bias could be used to illustrate a statistician's testimony concerning statistical bias. Further, the Court is not persuaded that it erred in excluding the exhibit under Rule 403. When balancing the exhibit's nonexistant probative value on the issue of statistical bias with its potential for undue prejudice to the defendant in view of the reference in the letter to the Bendectin litigation proceeding in the California Courts, the inescapable conclusion is that the exhibit was inadmissible. Fed.R. Evid. 403. Those concerns of the Court were not assuaged even after the numerical figures in the exhibit were redacted by the plaintiffs (T. 911).

This asserted error is denied.

## ASSERTED ERROR # B 12

*"The Court erred in excluding evidence that the Nulsen article about Bendectin was actually written by Defendants' employees."*

The plaintiffs attempted to have Dr. Scott discuss a 1956 article entitled "Bendectin in the Treatment of Nausea of Pregnancy" by Dr. Nulsen (pltfs.'s exh. 151). (T. 2233). Dr. Scott stated, however, that he was not familiar with the article. When the witness was asked why he did not look for the article in the medical literature an objection was raised. (T. 2234). The objection was based on two grounds: that it is impossible for any witness to explain why he did not read an article he did not know about, and that this article dealt with the efficacy of Bendectin rather than animal studies. (*Id.*). The Court observed that Dr. Scott, as a veternarian, had not testified as to whether Bendectin was a teratogen in humans but rather limited his opinion to Bendectin's potential teratogenicity in animals. (T. 2235; *see* T. 2195–96). Consequently, the objection was sustained on the ground that the cross-examination of Dr. Scott was improper. The issue of disputed authorship was never raised. (T. 2235).

The Court is unaware of any other reference in the trial transcript or in pre-trial motions to the exclusion of an article authored by Dr. Nulsen that was allegedly written by the defendant's employees. Accordingly, the plaintiffs' unsubstantiated allegation of error is denied.

## ASSERTED ERROR # B 13

*"The Court erred in excluding evidence that Merrell deliberately chose a dishonest clinical investigator to conduct some of the tests relied on by Defendant's witnesses."*

---

**16.** The Court assumes, without deciding, for the purpose of this discussion that the letter exemplifies legal bias.

The Court cannot discern the basis for this asserted error. In a letter dated June 25, 1985, the Court requested from plaintiffs' counsel a clarification of this error and supporting transcript references. With no answer forthcoming, the Court again asked plaintiffs' counsel, in open court on August 2, 1985, for assistance. Although counsel promised swift response, the Court has to date received no answer to its inquiries and can only conclude either that plaintiffs cannot substantiate or have withdrawn this asserted error.

## ASSERTED ERROR # B 14

*"The Court erred in excluding evidence of the circumstances under which Bendectin was removed from the market."*

The defendant filed a Motion in Limine to Exclude Evidence of Cessation of Production of Bendectin (doc. no. 1591), which was opposed by the plaintiffs (doc. no. 1660). The Court ruled on February 19, 1985, granting the defendant's motion in limine. (Doc. no. 2862).

The Court stands by its previous ruling. The fact that the defendant ceased the manufacture of Bendectin on June 8, 1983 does not tend to make a fact of consequence in the causation phase of the trial more or less probable. Fed.R.Evid. 401. The mere fact that Bendectin was removed from the market, for whatever reason, is clearly irrelevant to the inquiry of whether Bendectin is a human teratogen. Evidence which is not relevant is inadmissible at trial. Fed.R.Evid. 402. Consequently, the evidence at issue was properly excluded.

Furthermore, even if the evidence is viewed as relevant, the minimal probative value of the evidence would have been outweighed by the danger of unfair prejudice to the defendant, by the jury's consideration of the evidence as an admission of liability, and by the undue delay of the trial resulting from litigating this collateral matter. Fed.R.Evid. 403. *See, e.g., Lindsay v.*

*Ortho Pharmaceutical Corp.,* 637 F.2d 87, 94 (2d Cir.1980).

Finally, the Court later notation ordered a denial of the plaintiffs' Motion for Reconsideratin of the Court's Order in Limine Precluding Evidence of the Cessation of Production of Bendectin (doc. no. 2671) and wrote in the order that its denial of the motion was "without prejudice to resubmission at a liability trial." (Doc. no. 2671, dated Feb. 5, 1985). Although the plaintiffs allege error committed at trial, the Court is unaware of this matter being brought to its attention at any time other than by a pre-trial motion. Finding the alleged error without foundation, it is denied.

## ASSERTED ERROR # B 15

*"The Court erred in excluding evidence that Merrell had planted false articles in medical literatures by paying witnesses such as Milan Korcok to write articles favorable to Bendectin."*

During the cross-examination of Dr. Newberne, the plaintiffs asked whether Merrell made an active attempt to generate favorable articles in the literature concerning the safety of Bendectin. (T. 2461). An objection was raised by the defendant. The plaintiffs attempted to substantiate their claim of bias by referring to an article favorable towards Bendectin that was paid for by Merrell. (T. 2462). It was noted that the article was not, in fact, a medical article but rather an article written by a nonphysician journalist. (*See* Pltfs.'s Exh. 701).

The Court affirms its previous analysis, which resulted in the objection being sustained. The article offered by the plaintiffs to support their theory that the defendant had tainted the medical literature and, thereby, medical opinions based on such literature, was not a medical study or medical article at all. It was instead a news article synopsizing the Bendectin teratogenicity debate, authored by a nonphysician, which addressed, among other things, the Mekdeci [17] trial and the FDA's approval

17. This is a reference to an earlier Bendectin trial, captioned *Mekdeci v. Merrell-National Laboratories,* No. 77–255–ORL.–CIV (M.D.Fla.1980).

of Bendectin. (Pltfs.'s Exh. 701). There was no foundation laid to support the plaintiffs' underlying assumption that such an article is of a type reasonably relied upon by experts in the field to form an opinion on the teratogenicity of a drug. Therefore, the evidence was irrelevant and inadmissible. It did not tend to make a fact of consequence in the causation phase of the trial more or less probable. Fed.R.Evid. 401, 402. Alteratively, even assuming it was relevant evidence, the low probative value of the evidence was substantially outweighed by the danger of unfair prejudice to the defendant. Fed.R.Evid. 403.

The Court is unaware of any other instances where evidence such as this was excluded during the course of trial. Indeed, when asked to specify a citation to the trial transcript to support this assertion of error, the above-mentioned event was the only incident referred to by the plaintiffs. Their allegation of error is dismissed as meritless.

## ASSERTED ERROR # C 1

*"[The Court erred in failing to allow discovery into] the Friedman patients in the Bunde-Bowes [sic] study after fraudulent test data was discovered in two other obstetrical groups contained in the study,"*

This asserted discovery error pertains to the records of Dr. Friedman's patients who were the subject of the Bunde-Bowles study. Those records are now in the possession of Doctors Youkilis and Essig who succeeded Dr. Friedman in his practice. Plaintiffs' Motion to Compel Production of these records was denied orally at a hearing held on July 15, 1983. (Doc. nos. 715, 725). Prior to that hearing, Doctors Youkilis and Essig moved for a protective order and attached a proposed stipulated order. (Doc. no. 658, exhibit B). That proposed order was reasonable in that it allowed plaintiffs to extract the information they needed while at the same time protecting the patients' right to privacy, a point plaintiffs later conceded. (Doc. no. 699). At the July hearing, however, plaintiffs argued for more extensive discovery and that

request was denied as beyond the scope of discovery and as infringing on the doctor-patient privilege. (Doc. no. 725 at 8).

At an August 5, 1983 hearing on the plaintiffs' Motion to Reconsider the July order, (doc. no. 699), plaintiffs indicated their willingness to agree to the doctors' proposed protective order. (Doc. no. 890 at 4). The parties were apparently in agreement at that point and the Court agreed to issue any order they may agree to. (*Id.* at 4–8) The Court's only concern was that the patients' privilege would not be compromised. (*Id.* at 7) This concern is consistent with Federal Rules of Civil Procedure 26(b)(1)'s exemption of privilege from the scope of discovery.

Under the impression that the parties had resolved their discovery dispute, the Court recorded plaintiffs' Motion for Reconsideration as moot. (Doc. no. 887). The Court can find no error in its ruling on this matter.

## ASSERTED ERROR # C 2

*"The Court erred in denying Plaintiffs the opportunity to depose FDA personnel and the discovery of related FDA documents."*

Plaintiffs responded to the Court's request for clarification of this alleged error by indicating that it took place at a conference held August 19, 1983. (Doc. no. 3167). A review of the transcript from that conference indicates that the Plaintiffs' Lead Counsel Committee and a representative of the United States Attorney reached an agreement as to the production of government documents. (Doc. no. 889 at 3, 5).

As to the FDA personnel, plaintiffs wanted to depose the Commissioner of the FDA and a Project Officer concerning a rat study. The sole reason for deposing the Commissioner was to uncover the basis of his statement that withdrawing Bendectin from the market was purely a business decision. (*Id.* at 7) In light of the Court's ruling that evidence of defendant's decision would not be admitted at trial, nor would evidence of FDA approval of the drug, the

quashing of the subpoena addressed to the Commissioner was a proper ruling.

As to the FDA Project Officer, her sole relation to Bendectin was that she reviewed a rat study. (*Id.* at 10). Plaintiffs had possession of the study and were deposing the person who conducted it. Subjecting such a peripheral witness to deposition would fall within Federal Rules of Civil Procedure 26(c)'s definition of oppressive discovery.

In the case of both witnesses, the Court gave plaintiffs leave to resubpoena them if the need arose. (Doc. no. 889 at 12–13). Plaintiffs did not resubpoena them and the Court finds no error in its rulings.

## ASSERTED ERRORS # C 3 & C 6

*"The Court erred in denying Plaintiffs access to adverse reaction experiences of other drugs manufactured by Defendant or its predecessor containing ingredients in Bendectin"* and *"in refusing to allow discovery into other drugs manufactured by the Defendant to show a pattern of conduct consistent with utter disregard for human safety."*

These asserted errors are the product of the Court's March 22, 1983, Order limiting discovery to information concerning Bendectin and its component chemicals, either alone or in combination with other Bendectin components. (Doc. no. 362). *In re Richardson-Merrell, Inc.*, 97 F.R.D. 481, 484 & n. 1 (S.D.Ohio 1983). (Appendix F)

The Court's March, 1983 ruling turned on a determination of the scope of discovery to be accorded plaintiffs. The Court's determination was set forth with some degree of specificity and need not be reiterated here. The Court wishes only to add that its Order was consonent with the command of Federal Rule of Civil Procedure 1 that the civil rules governing discovery be construed "to secure the just, speedy, and inexpensive determination of every action." Further, Rule 26(c) sanctions denial of discovery requests when necessary to protect a litigant from annoyance, oppression, or undue burden or expense. A reading of plaintiffs' assigned

errors C 3 and C 6 confirms that not confining discovery to Bendectin and its components alone or in combination with other components would have necessarily opened all of defendant's drugs to discovery—a result that would be truly oppressive and would thwart any attempt at a just, speedy, or inexpensive determination of the action. Support for the Court's position can be found in *Uitts v. General Motors Corp.*, 62 F.R.D. 560 (D.C.Pa.1974) where the Court refused discovery into the recall of engine mounts different from the type involved in the accident that injured plaintiffs. Similarly, in *Cooper v. R. J. Reynolds Tobacco Co.*, 158 F.Supp. 22 (D.C. Mass.1957), *aff'd*, 256 F.2d 464 (1st Cir.), *cert. denied*, 358 U.S. 875, 79 S.Ct. 112, 3 L.Ed.2d 105 (1950), the Court denied discovery into defendant's advertising that did not relate to the specific representations relied on by plaintiff.

## ASSERTED ERROR # C 4

*"The Court erred in denying Plaintiffs access to documents of the CDC after Merrell referred to a CDC employee as 'our consultant'."*

Plaintiffs advanced a clarification of this asserted error in which it stated, in toto, the following:

> *Error C.4*— This order denying discovery was actually issued by the United States District Court in Atlanta. The Holtkamp memorandum stating that Dr. Oakley, a federal employee, was actually a Merrell consultant is enclosed. The Notice of Deposition for the Centers for Disease Control's deposition and document production, which was quashed, is also enclosed.

(Doc. no. 3167). This explanation provides little assistance. No District Court should be held responsible for the alleged errors of another District Court. Further, it appears from a letter addressed to Mr. Eaton, Chairman of the Plaintiffs' Lead Counsel Committee, from Gene W. Matthews, counsel for the CDC, that after receiving more than 15,000 pages of documents from the CDC, Mr. Eaton agreed that his discovery

needs had been met. (Doc. no. 3168), Exh. 2). The Court finds no merit in this alleged error.

## ASSERTED ERROR # C 5

*The Court erred in refusing to allow discovery into fraudulent animal and human tests which were conducted contemporaneously with and by the same persons conducting Bendectin tests.*

Plaintiffs specify that this asserted error is directed towards its discovery attempts of the patients of Drs. Youkilis and Essig and into laboratory notebooks of the Staples study. (Doc. no. 3167). As to the doctors' patients, this asserted error is duplicative of # C 1 and is addressed there.

As to the Staples study, Plaintiffs were denied only the information pertaining to MER–29 and Thalidomide. This was consistent with the Court's Order of May 22, 1983. (Doc. no. 362). That Order is discussed in conjunction with asserted errors C 3 and C 6.

## ASSERTED ERROR # D 1

*"[The Court erred in admitting] testimony of Dr. Goddard thus creating an inference of FDA approval and safety."*

Admission of Dr. Goddard's testimony is governed by Federal Rules of Evidence 702 and 403. Rule 702 defines an expert as anyone with scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue. Dr. Goddard, with his medical doctorate, master's degree in Public Health from Harvard University, professorship at Emory University, and 20 years in the public health field, certainly possesses specialized knowledge that would assist the jury in considering whether Bendectin causes birth defects. With his testimony thus admissible, plaintiffs' only hope for excluding it lies with Federal Rule of Evidence 403.

Plaintiffs' chief argument for precluding Dr. Goddard's testimony under Rule 403 is based on the prejudice plaintiffs feel they suffered from Dr. Goddard being a former commissioner of the Food and Drug Administration (FDA). Plaintiffs argue that Dr. Goddard's testimony on behalf of defendant could give the jury the impression that the FDA approved the safety of Bendectin. The fact is that the FDA did approve Bendectin as safe. Upon a motion by plaintiffs, the Court ruled, however, that evidence of such approval was inadmissible under a Rule 403 analysis. (Doc. no. 2862). Nevertheless, plaintiffs feared that the mere appearance of Dr. Goddard on behalf of defendant would lend an aura of FDA approval to defendant's position. At trial, the Court reminded the defense counsel that the subject of FDA approval was a forbidden topic of interrogation. (T. 2562–63). The Court then allowed plaintiffs to conduct a voir dire of Dr. Goddard's qualifications in the presence of the jury. This was the only expert whose expertise was thus called into question. (See pages 1219–1220 *supra*)

■ Under a Rule 403 analysis, however, the Court ruled that Dr. Goddard could testify and allowed some brief mention of his position with the FDA only as part of his expert qualifications in the field of public health. Rule 403 allows exclusion of expert testimony only if its relevance is substantially outweighed by the danger of unfair prejudice. "[T]he Court must look at the evidence in the light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Smith*, 736 F.2d 1103, 1107 (6th Cir.1984). When viewed in this light, the doctor's testimony was highly probative on the issue at hand and the possibility of prejudice arising from the unlikely inference of FDA approval was slight. This assessment was borne out by the subsequent interrogation. Defendant asked Dr. Goddard four short questions on his FDA work. These questions were commensurate with qualification questions asked of his other positions in the public health field. (T. 2574). No mention was made of FDA approval. Dr. Goddard based his opinions on his 20 years in the public health field, not on his two and a half with the FDA. (T. at 2655).

Plaintiffs, on the other hand, spent far more time on Dr. Goddard's FDA years by going over many of his duties and activities there. (T. 2669–84). Still, no actual link was made between Bendectin and Dr. Goddard's FDA years. The Court fails to see, therefore, how the jury could make the inference that the plaintiffs fear.

**ASSERTED ERROR # D 2**

*"[The Court erred in admitting] testimony of Dr. James Goddard regarding the Lamm charts without prior warning to Plaintiffs."*

This asserted error is discussed in detail *supra* at pages 1224–26.

**ASSERTED ERROR # D 3**

*"[The Court erred in admitting] testimony about the FDA's Advisory Committee circa 1980."*

Plaintiffs comment no further on this alleged error nor do they particularly identify the testimony in question. A review of the transcript indicates that defendant wished to have their expert Dr. Goddard testify that one of the grounds for his expert opinion was a report of the Fertility and Maternal Health Drug Advisory Committee of September 15 and 16, 1980. Before Dr. Goddard could testify on the report, plaintiffs vigorously objected. The Court then made several rulings to accommodate their concerns. (T. at 2635–52). As a result of the Court's rulings, defendant abandoned any attempt to elicit testimony on the report expressing its opinion that the redacted version had little value to their case. (T. at 2652). In fact there was no testimony on the advisory committee nor was its report admitted into evidence. There can, therefore, be no error against plaintiffs.

**ASSERTED ERROR # D 4**

*"[The Court erred in admitting] the SRI mutagenicity test which constitutes attorney work product."*

This was a study commissioned by the law firm of Cohen & Kokus for the purpose of determining whether Bendectin was mutagenic. (T. at 2531–34). Mr. Kokus is a member of Plaintiffs' Lead Counsel Committee. The study was conducted by the Stanford Research Institute and concluded that no mutagenic activity was present. (T. at 2532–33).

■■■ The study was used twice by defendant at trial. The first time was in conjunction with the expert testimony of Dr. James Newberne. Dr. Newberne testified that he relied on the study to form the basis of his expert opinion. (T. at 2531). The second use of the study was its admission into evidence in defendant's surrebuttal. (T. at 3349–54). At neither time did plaintiffs object to its use or admission on the basis of the work-product doctrine. Such an omission constitutes a waiver of the objection. Rule 103(a)(1) of the Federal Rules of Evidence states that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... a timely objection or motion to strike appears of record stating the specific ground for the objection if the specific ground was not apparent from the context ...." *See, e.g., United States v. LeBlanc,* 612 F.2d 1012, 1014 (6th Cir.1980); *United States v. Brady,* 595 F.2d 359, 363 (6th Cir.1979); *United States v. Ruffin,* 575 F.2d 346, 355–56 (6th Cir.1978). Since plaintiffs did not make any specific objection on work-product grounds on anything close to that, and there was no way for the Court to guess at its application from the context of the discussion, plaintiffs' assignment of error on that ground is waived.

**ASSERTED ERROR E**

*"The Judgment Entered by jury is contrary to the weight of the evidence and is based in part on allegedly false evidence not subject to cross examination."*

A clarification of this alleged error by plaintiffs indicates that the allegedly false evidence is the Lamm charts. (Doc. no. 3167). The propriety of admitting these charts into evidence is discussed at another portion of this Order. (*See* pp. 1224–26 *supra*). This section will consider only

whether the judgment was contrary to the weight of evidence.

As to plaintiffs' claim that the judgment, actually the jury's verdict, is contrary to the weight of the evidence, the Court is guided by the following standard.

In ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, a district judge may compare the opposing proofs and weigh the evidence and it is the duty the judge to set aside the verdict and grant a new trial if he is of the opinion that the verdict is against the clear weight of the evidence. *Moran v. Johns-Manville Sales Corp.*, 691 F.2d 811 (6th Cir.1982); *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir.1982). However, "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944). "Thus, while the district judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached." *Bruner v. Dunaway*, 684 F.2d at 425.

*Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir.1984).

■ Upon consideration of the five weeks of testimony, and upon a review of plaintiffs asserted errors, it is the the opinion of this Court that the jury's verdict was reasonable and not against the clear weight of the evidence. Both sides presented testimony of eminently qualified and highly credible experts who differed in regard to the safety of Bendectin. The jury was confronted with the classical task of any jury i.e., assess the credibility of each witness resolve all conflicts of fact. The jury here reached a verdict that was well within the scope of the evidence presented and the bounds of reason.

## ASSERTED ERROR F

*"The Court erred in giving the jury the proximate cause charge given and the corresponding jury question under the facts and circumstances of this case."*

The sole issue at this phase of trial was whether Bendectin caused birth defects.

Predictably, both sides proposed definitions of causation favorable to their respective positions. Still, both referred to cause-in-fact as "proximate cause." (Doc. nos. 2981 at 22; 3024 at 22). Defendant, for its part, objected to any instruction that would allow plaintiffs to recover if the jury found Bendectin to be "a," as opposed to "the," proximate cause of birth defects. (Doc. no. 3024 at 28). The Court rejected defendant's reasoning as inconsistent with the Ohio law on causation and framed the causation issue in terms of "a" proximate cause. (Appendix C # 5730). Further, the Court gave, in substantial part, plaintiffs' proposed paragraph on contributing factors. (Doc. no. 2981 at 22).

The Court defined proximate cause for the jury as "that which in a natural and continuous sequence produces an injury that would not have otherwise occurred." (Appendix C ¶ 5730). There are only two substantial differences between this definition and the definition proposed by plaintiffs. The first is that the plaintiffs added a sentence requiring the jury to find that the harm caused by Bendectin was foreseeable. This additional requirement would make it harder for the plaintiffs to prove their case and the Court does not understand why it was submitted. The Court nevertheless ruled that foreseeability did not belong in this portion of the trial and declined to give the instruction. This ruling was to the advantage of the plaintiffs.

■ The second difference between the charge given and the one proposed by plaintiffs was plaintiffs' addition of the phrase "or plays a substantial part in bringing about [the harm]." This phrase finds no clear support in Ohio law, a point plaintiffs conceded at the charge conference. (T. 3379–81). Nevertheless, plain-

tiffs urged the Court to make new law for the state. (*Id.*) The Court declined to take such a drastic step for a number of reasons. First, the *Erie* Doctrine counsels against the creation of new state law. Second, the requested phrase added little to the definition and was duplicative of the explanatory paragraph on contributing factors submitted by plaintiffs and substantially given by the Court. Finally, the definition of probable cause given by the Court is accurate, simple, easily understood by lay people, and soundly based on Ohio law. The Court strove to extract from Ohio opinions the language most accurately reflecting the concept of cause in fact. *See Bier v. New Philadelphia,* 11 Ohio St.3d 134, 135, 464 N.E.2d 147 (1984); *Strothers v. Hutchinson,* 67 Ohio St.2d 282, 287, 423 N.E.2d 467 (1981); O.J.I. § 11.10 (1983).

Plaintiffs, therefore, have no valid grounds for objecting to the proximate cause charge or special interrogatory that parallels its language.

## ASSERTED ERROR G

*"The Court erred in failing to give the requested FDA jury instruction in light of the testimony of Dr. James Goddard under the facts and circumstances of this case."*

Plaintiffs requested that the Court give the following instruction.

Any opinions held by the FDA (or its employees), any acts of the FDA (or its employees), and any omissions of the FDA (or its employees) relating to the drug Bendectin or to the defendant Merrell-Dow Pharmaceuticals, Inc., are irrelevant to the issues before you and are not to be considered by you during your deliberations or relied upon [sic] you in reaching your verdict.

(Doc. no. 2981 at 19).

■ Since defendant's expert witness Dr. Goddard was the only FDA-affiliated person to testify, this proposed instruction could only have been aimed at him. The instruction, in effect, orders the jury to disregard his testimony. The propriety of Dr. Goddard's testimony has been discussed at length in other portions of this order (pp. 11–13; 24–27; 70–72 infra), and need not be repeated here. Suffice it to say that since Dr. Goddard was a proper witness, and plaintiffs were adequately protected from prejudice by the Court's exclusion of all evidence that the FDA approved Bendectin, (doc. no. 2862) the proposed instruction was properly denied.

## ASSERTED ERROR # H 1 [18]

*"The Court erred in allowing the Defendant to systematically exclude all Blacks from the jury through voir dire".* [19]

## ASSERTED ERROR # H 2

*"The Court erred in the application of choice of law principles regarding jury instructions inasmuch as non-resident Plaintiffs may have been entitled to alternative instructions."*

■ Rule 51 of the Federal Rules of Civil Procedure states that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Plaintiffs herein did not object to the Court's instructions on choice of law grounds. In fact, they based their requested instruction on Ohio law, as did the defendant. Since those cases not filed in Ohio "opted in" with a specific understanding that Ohio law would apply, they cannot now be heard to request the law of

---

**18.** There appears to be some duplication of subject matter in the asserted errors beginning with section "H".

Since the Court has been aware of divisions of opinion among Lead Counsel, it will be assumed that the duplication has resulted from such division.

**19.** Upon direct challenge by the Court at the hearing Aug. 2, 1985, plaintiff agreed that this assignment of error lacked support and withdrew it from consideration. (Doc. no. 3179 at 4–5).

a different state.[20] Under Rule 51 plaintiffs are barred from asserting this error.

### ASSERTED ERROR # H 3

*"The Court erred in circumscribing Plaintiffs' right to individual counsel of choice. "*

The Court assumes by this error that Plaintiffs' Lead Counsel Committee is contesting its own appointment. The Committee does not, however, expand on the above sentence, nor did it complain about its status prior to the verdict. Such silence would likewise constitute a waiver of the alleged error. *U.S. v. Martin*, 757 F.2d 770, 771 (6th Cir.1985)

▇▇ The appointment of Plaintiffs' Lead Counsel Committee in this case was a valid exercise of the Court's managerial power. Federal Rule of Civil Procedure 42(a) gives a trial court the discretion in consolidated cases to "make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." That language sanctions the appointment of a lead counsel committee in complex cases. *See e.g., Vincent v. Hughes Air West, Inc.,* 557 F.2d 759 (2d Cir.1977); *In re Air Crash Disaster at Florida Everglades,* 549 F.2d 1006 (5th Cir.1977). The power of the committee may even extend to usurp some of the initiative of noncommittee counsel. *See, e.g., Vincent,* 557 F.2d at 773–74; *Farber v. Riker-Maxson Corp.,* 442 F.2d 457, 459 (2d Cir.1971).

Usurpation, however, has not been the problem here. No individual plaintiff has as yet complained that any right to counsel has been violated. The litigation herein involves the consolidation of over 800 cases, many of which have multiple plaintiffs. Litigation of this magnitude can only be tried by a small number of counsel responsible for administering the suit and coordinating its prosecution. Society, the judicial system, and the litigants all benefit from the resulting efficiency and concentration of resources. In these days of burgeoning litigation, Rule 42(a)'s goal of avoiding unnecessary costs or delays compels the appointment of a lead counsel committee in case of such as this. Plaintiffs asserted error is denied.

### ASSERTED ERRORS # I, 1, 2, 3, 4, & 5 [21]

*"Plaintiffs were specifically prejudiced by being prohibited from introducing the following evidence at trial:*

*(1) The testimony of George Horner, M.D., Ruth Williams, Ismolene Smock and Carl Bunde, M.D., concerning the misclassification, inaccurate reporting and potential fraud in the 1963 Bunde-Bowles study relied upon by defendant as proof of safety;*

*(2) The factual testimony of Donald Johnson and Karen Pajari concerning drug experience reports and drug experience reporting, specifically patterns of injury indicative of cause and defect;*

*(3) The testimony of Robert Powell Merrell's Vice President for Regulatory Affairs, concerning safety data and contacts with physicians;*

*(4) The testimony of Ray O. Nelson M.D. concerning the fraudulent creation of safety data in the medical literature.[22]*

Although these allegations are categorized as trial error, the Court has reviewed the trial transcript and finds that the issue

---

**20.** The Court's Order of Consolidation and Separation (Doc. 1066, Nov. 16, 1983) provides on page 3 thereof: "All other cases transferred to the Southern District of Ohio under MDL 486 may likewise be consolidated for the limited purposes set forth by application of ·plaintiff counsel. Upon receipt of such application, the Court will, in accordance with 28 U.S.C. § 1404, likewise consolidate such cases for the limited purpose of determining issues of liability.

*By such application, counsel will consent that issues of liability be tried in accordance with the*

*substantive law of the State of Ohio.* (emphasis added)

**21.** These asserted errors did not appear in plaintiffs' initial Motion For a New Trial (doc. no. 3093), but were subsequently included in Plaintiffs' Memorandum in Support (doc. no. 3098). The Court has supplied its own numbering system to these asserted errors under the letter "I".

**22.** *See, supra* at 1220–22 with respect to bifurcation of issues; see also 60–61 concerning Nulsen article.

was not raised. The decision to limit the witnesses in the first phase of the trial to expert witnesses was made after discussing the matter with counsel at the Final Pretrial Conference (doc. no. 1814 at 2–9, 27–32; *see* doc. no. 2434 at exh. C (Memorandum to the parties from J. Rubin, dated Jan. 11, 1985)). The conclusion reached was that the issue of whether Bendectin is a teratogen is more properly evaluated by expert rather than fact witnesses. Because the first phase was limited to causation, any issues involving fraud or misrepresentation were to be presented in the next phase at which time fact witnesses would be permitted. The plaintiffs expressly affirmed that they did not dispute the preclusion of fact witnesses in the causation phase of the trial. "[The plaintiffs] do not dispute the format of this trial nor do they dispute that the respective parties during their case in chief, will be limited to the use of expert witness [sic]." (doc. no. 2468 at 2).

It is noteworthy, however, that the use of fact witnesses for rebuttal purposes in the first phase of the trial was not prohibited. (*See* doc. no. 1814). The fact that the Court did not rule out the option of using fact witnesses for rebuttal is acknowledged by the plaintiffs themselves and exemplified by two instances. First, the Court stated that it would reconsider potential rebuttal testimony after the defendant's case if such testimony "could not be reasonably anticipated." (T. 3291). The second instance involves a ruling on a pretrial motion of the defendant to quash the plaintiffs' subpoena of five fact witnesses[23] for appearance at trial (doc. no. 2434). The plaintiffs argued in their Memorandum in Opposition (doc. no. 2468) that the witnesses may properly be called as rebuttal witnesses but that they were unable to determine the necessity of their testimony until the defendant has presented its case. In

its Order of February 19, 1985, the defendant's Motion to Quash Trial Subpoenas was denied. (Doc. no. 2862).

The plaintiffs did not attempt to offer the testimony of Powell, Horner, Williams, Smock, Bunde, Johnson, Pajari, or Nulsen at the end of their case in chief nor when presented with the opportunity to do so in rebuttal. Instead, the witnesses offered for rebuttal were Drs. Brusick, Petrow, Garfinkel, and Mrs. Schaffer (T. 3223; 3241–42; 3288; *see* 3222–35). Clearly, Mrs. Schaffer, a plaintiff, was offered as a fact witness. The propriety of admitting her testimony was not disputed on that basis.

Simply stated, the Court did not prohibit the plaintiffs from calling the witnesses. Since the plaintiffs elected not to call the named witnesses in rebuttal, there is no basis upon which to rest their assertions of error.

## ASSERTED ERROR # I 5

*"[The Court erred in] denying admission of a document showing Carl Bunde, M.D.'s (ergo, Merrell's) agreement to destroy data from Bendectin clinical investigations."*

At the outset, it is noted that once again the plaintiffs have not provided the Court with a citation to the trial transcript nor to a document number which would lend factual support to their allegation.[24] It is further noted that Dr. Bunde was never called as a witness during the proceedings and the Court is unaware of precluding the admission of such a document during trial.

The Court is familiar with one incident to which the plaintiffs may be referring. While conducting the deposition of Dr. Bunde on February 22, 1984, the parties came before the Court for a ruling on several evidentiary matters. There was a

---

**23.** The witnesses listed in the subpoenas include: Hoekenga, Kuhn, Newberne, Holtkamp, and Bunde. Newberne was presented as a defendant's witness. Of the eight fact witnesses the plaintiffs now assert should have been permitted to testify, only Bunde was served with a subpoena.

**24.** In view of the fact that there were approximately 3,000 exhibits identified in this case, the reference by the plaintiffs to "a document" is something less than helpful.

**1248**

dispute concerning the use of Hearing Documents Nos. 4, 5. The transcript of the conference is informative.

> The Court: But Hearing Document No. 4 does contain references, does it not?
>
> Mr. Eaton: *I don't want that in evidence.* All I want to ask him is did he urge that these documents from ‚this practice be destroyed? Did he say that yes, they should be destroyed. After that, was it proper for them to choose such a man to perform the definitive clinical study on this drug. That's the only point I'm after. Absolutely the only point.
>
> Dr. Woodside: If that's what you are after, you don't need the documents.
>
> Mr. Eaton: *I don't want the document in evidence.*
>
> The Court: *Hearing Document No. 4, by agreement, will not be used in evidence and will not be referred to.* Hearing Document 5, which I'm seeing for the first time—
>
> Mr. Eaton: This is the one that he said should be destroyed, You Honor, the document should be destroyed.
>
> The Court: I thought you agreed—
>
> Mr. Eaton: *I don't want it in evidence.* I only want to ask, "Did you make this statement that these documents should be destroyed?" That's all I want to ask him. That's the only point.
>
> . . . .
>
> The Court: Look, I've ruled on the documents you've submitted. *Hearing Document No. 5 is clearly not admissible.* This deals largely with Thalidomide and I

think that in view of your statement, gentlemen, *it's agreed it's not.*
(Doc. no. 1505 at 14–17) (emphasis added).

Several things are clear from a review of the transcript. First, the plaintiffs allege that the Court erred in barring the admission of "a document." The fact is, the plaintiffs repeatedly stated that they did *not* seek to introduce Hearing Documents Nos. 4, 5 into the record. Indeed, the record confirms that the parties did agree that the documents would not be admitted. Second, the plaintiffs were not prevented from examining Dr. Bunde in his deposition on the matter of whether he recommended that certain Thalidomide records be destroyed. Third, the Hearing Documents at issue did not involve Bendectin but referred to Thalidomide and MER–29. Finally, the Court stated that it would reconsider the plaintiffs request if the documents were needed to impeach the trial testimony of Dr. Bunde (doc. no. 1505 at 15, 18–19). Having failed to substantiate the alleged trial error, it is denied.

**ASSERTED ERROR # I 6**

*The Order to try the causation issue separately was a surprise that impeded Plaintiffs' trial preparation.* [25]

▉ Plaintiffs claim in their memorandum in support of their motion for new trial that they were surprised by the Court's Order establishing causation as the first issue to be tried and that this surprise impeded the presentation of some of their experts by video tape. (Doc. no. 3098 at 16–17). The Order plaintiffs are referring to was docketed April 13, 1984. (Doc. no. 1580).[26] Trial was originally set for June 11, 1984, but was postponed until February 1, 1985. The Court's April order gave

---

**25.** The Court has substituted its language here to summarize plaintiffs' asserted error found in doc. no. 3098 at 16–17.

**26.** Plaintiffs' claim of surprise is also inconsistent with the Court's Order of April 12, 1984 (doc. no. 1577) which provides in part: "The previous Order of this Court establishing the issues for trial in this matter dated December 29, 1983 (Doc. No. 1148) is hereby amended.

Commencing on June 11, 1984, all issues involving liability of the defendant will be tried.

These include by way of example only, product liability, failure to warn, negligence, breach of contract and fraud.

In addition to the foregoing, all issues involving causation will likewise be heard. The trial of this matter on liability issues will be bifurcated and *questions relating to causation will be considered first.* A jury determination on such issues will be made before any other matter is considered. (emphasis added)

plaintiffs over nine months to take new depositions or arrange to have the witnesses testify live.

In addition to the foregoing, the Court notes in passing that the procedure of trying causation first was not new to lead counsel member Stanley Chesley. He was a member of a Lead Counsel Committee before this Court in *In re Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir. 1982), where the same procedure was followed. It was Mr. Chesley who suggested an initial causation trial as early as July 1, 1983.[27]

The Court's April Order, therefore, caused the plaintiffs no prejudice in the presentation in their case.

### ASSERTED ERROR # I 7

*"Plaintiffs were not allowed to discover or present concurrent fraud which would have shown that Carl Bunde, M.D., Harold Werner, and other Merrell personnel falsified or concealed animal data and manipulated and misstated data from clinical investigations concerning MER–29 at about the same time Merrell was performing tests on Bendectin."*

The Court first considered this matter on March 22, 1983, when it ruled that MER–29 and Thalidomide were subjects beyond the scope of discovery. (Doc. no. 362 at 5–6). The Court's reasoning is more fully explained in the portion of this order dealing with discovery matters. (*See* p. 1241 *supra)* That same reasoning would apply to exclude evidence regarding MER–29 from trial under the Federal Rules of Evidence. Such evidence is irrelevant under the definition of relevance in Rule 401. Should this evidence be found to have any relevance at all, it would be far outweighed by the unfair prejudice it would engender. Federal Rule of Evidence 403.

27. We would try on the common issue of causal connection, is this a teratogen, and once we had a result as to those cases, we could then branch out, and as far as I'm concerned, Your Honor, once liability, if it's not established, we are over. If it's established, then the damage thing can be done in some kind of other concept of funds for different groups of persons.

### CONCLUSION

Upon review of the asserted errors, the memoranda filed both in support thereof and in opposition thereto and upon consideration of the oral arguments made in this matter on August 2, 1985, it is the opinion of the Court that plaintiffs received a full and fair hearing of their claims before a properly impaneled and instructed jury.

Accordingly, the Motions for Judgment Non Obstante Veredicto and and For a New Trial are each hereby DENIED.

IT IS SO ORDERED.

### APPENDIX A

### IN THE UNITED STATES DISTRICT COURT

### FOR THE SOUTHERN DISTRICT OF OHIO

### WESTERN DIVISION

### IN RE: BENDECTIN LITIGATION

### THIS ORDER RELATES TO THE FOLLOWING CASES: SEE LIST ATTACHED

Nov. 16, 1983

### ORDER OF CONSOLIDATION AND SEPARATION

This matter is before the Court pursuant to Order to Show Cause dated September 14, 1983 (Doc. No. 864) wherein the Court invited counsel to consider questions of joint disposition of the *Bendectin* litigation. There are currently pending approximately 360 cases [1] involving the production by Defendant of the drug Bendectin. It is altogether probable that more such cases will be filed in the future.

This is essentially product liability litigation. There are common questions of law and fact that would be applicable to all plaintiffs. There is a basis for certifying a class pursuant to Rule 23(b)(1)(A) of the

1. Of this number, 178 have been transferred to the Southern District of Ohio by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407. These cases have been identified generally as "MDL 486". 184 cases have been filed directly in the Southern District of Ohio.

Federal Rules of Civil Procedure. The Court is aware that inconsistent adjudications have already occurred and more are likely in the future. A persuasive argument can be made that the *Bendectin* litigation is appropriate for certification of a class and a uniform decision on issues of liability.

There is, however, some authority for the proposition that class actions are not appropriate for mass torts [2]. This does not appear to be the view of the United States Court of Appeals for the Sixth Circuit [3].

There is a more compelling reason in this case to consider an alternative to class certification. A case tried in the Southern District of Ohio would require imposition of the substantive law of Ohio. *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938).

A plaintiff injured in another state who invokes the jurisdiction of a Federal Court in that state should have the case tried in accordance with the substantive law of that state.

Product liability concepts are still emerging. A uniform standard has not yet appeared. It is not the mission of the Federal Courts to create one based upon the substantive law of a specific state.

There is no equivalent concern in the use of Rule 42 of the Federal Rules of Civil Procedure. Rule 42(a), Fed.R.Civ.P., permits consolidation of actions where "actions involving common questions of law or fact are pending." Rule 42(b), Fed.R. Civ.P., permits separate trials of any claim where such a separation would "be conducive to expedition and economy".

Accordingly, all *Bendectin* cases originally filed in the Southern District of Ohio or transferred in MDL 486 from the Northern District of Ohio are hereby consolidated in accordance with Rule 42, Fed.R. Civ.P., and set for trial beginning June 4, 1984 on all common issues of liability. This consolidation shall be limited to such purpose and upon a finding of liability against Defendant on all or any of such cases, individual damages trials will be scheduled.

All other cases transferred to the Southern District of Ohio under MDL 486 may likewise be consolidated for the limited purposes above set forth by application of plaintiff counsel. Upon receipt of such application, the Court will, in accordance with 28 U.S.C. § 1404, likewise consolidate such cases for the limited purpose of determining issues of liability.

By such application, counsel will consent that issues of liability be tried in accordance with the substantive law of the State of Ohio.

In the event of findings that will require trials on issues of damage, all cases both those originating in Ohio and those transferred pursuant to 28 U.S.C. § 1404 will be returned to the originating district for such damage trials.

Upon application for limited transfer and consolidation an Order in the form of Exhibit A attached hereto will be entered.

Counsel are directed to meet and submit to the Court by December 15, 1983, a Stipulation of Agreement as to all of the common issues of liability that may affect designated categories of cases. In the latter event, counsel shall list those cases included in each of such categories.

This Order shall apply only to those cases filed or transferred to the Southern District of Ohio prior to January 1, 1984. Cases filed or transferred subsequent to that date will be included only upon application of plaintiff counsel and consent of the Court.

**2.** *McDonnell Douglas Corporation v. U.S. District Court for the Central District of California,* 523 F.2d 1083 (1975); *In Re: Federal Skywalk Cases,* 680 F.2d 1175 (8th Cir.1982). The latter circuit, however, did not address the issue directly, but rather reversed the trial court's injunction against state courts considering similar litigation.

**3.** In *Coburn, Executrix v. 4–R Corporation,* 588 F.2d 543 (6th Cir.1978), the United States Court of Appeals for the Sixth Circuit denied a mandamus petition in a matter where a class had been certified. The litigation involved deaths and injuries arising out of the Beverly Hills Supper Club fire in May, 1977. Coburn, however, does not directly address the issue of class certification in mass tort litigation.

IT IS SO ORDERED.

S/ Carl B. Rubin
Carl B. Rubin,
Chief Judge
United States
District Court

IN THE UNITED STATES
DISTRICT COURT

FOR THE SOUTHERN
DISTRICT OF OHIO

WESTERN DIVISION

IN RE: BENDECTIN PRODUCT
LIABILITY LITIGATION

**MDL 486**

THIS MATTER RELATES TO:

ORDER OF LIMITED TRANSFER AND
CONSOLIDATION

This matter is before the Court for consideration of the application of Plaintiff for transfer and consolidation pursuant to Rule 42, Fed.R.Civ.P. and 28 U.S.C. § 1404. It appearing to the Court that the interest of all parties would be best served by such a transfer and consolidation, it is hereby ORDERED that the above-entitled matter be so transferred.

This Order shall be limited to transfer and consolidation of questions of liability only. A determination of damages, if necessary, shall be made in the District of origin. Upon determination of liability issues, this matter will be returned to such District.

IT IS SO ORDERED.

SDO – CASES

| | | |
|---|---|---|
| 3/82 | 80–286 | Sara Ann Hoffman, et al vs. Richardson-Merrell, Inc., et al |
| 2/12/81 | 81–69 | Robbin E. Thomas, et al vs. Merrell Dow Labs, Inc., et al |
| 3/82 | 82–224 | Troy Hill, et al vs. Merrell Dow Labs, Inc., et al |
| 3/22 | 82–327 | Allen Watson, et al vs. Merrell Dow Labs, Inc., et al. |
| 4/30 | 82–426 | Peter Stewart, et al vs. Richardson-Merrell, Inc., et al |
| 4/30 | 82–442 | W. Alan Hooks, et al vs. Merrell National Labs |
| 4/30 | 82–444 | Walton G. Bondurant, Jr., et al vs. Merrell National Labs |
| 4/30 | 82–445 | Carolyn S. Moorer, et al vs. Merrell National Labs |
| 4/30 | 82–447 | William A. Joppy, et al vs. Merrell National Labs |
| 5/6 | 82–469 | Claire Ann Hyslop, et al vs. Merrell National Pharmaceuticals, Inc. |
| 5/6 | 82–470 | Cory Gordon Vandervliet, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 5/11 | 82–483 | Frank H. Gordon, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 5/27 | 82–546 | Donald McCune, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 6/10 | 82–579 | John R. Dipietro, Admin, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 6/10 | 82–580 | Shane Ross Wood, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 6/14 | 82–590 | Vicki Elizabeth Crallan, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 6/17 | 82–607 | Andrew John Bryant, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 6/17 | 82–608 | Helena K. Lucas, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 6/17 | 82–609 | Michael Robert Pentland, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 6/17 | 82–610 | Walter Arnold Theel, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 6/17 | 82–611 | Daryl John Turnbull, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 7/2 | 82–657 | Barbara Swain, et al vs. Merrell Dow Pharmaceuticals, Inc. |
| 7/19 | 82–711 | Diane L. Sauvageot, et al vs. Merrell National Labs |
| 7/29 | 82–730 | Anthony Ciervo, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 7/29 | 82–731 | James Emzy Risner, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |

SDO – CASES

| | | |
|---|---|---|
| 8/16 | 82–789 | Robert Faraday, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/16 | 82–802 | Andrew James Skinner, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/9 | 82–955 | Christine Grahm, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/14 | 82–963 | Joseph Feldhaus, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/14 | 82–964 | Irving Rosenstein, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/14 | 82–965 | Frank A. Stuart, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10/6 | 82–1039 | Kimberly Ann Wykoff, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/16 | 82–1321 | Vicki E. Crallan, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/17 | 82–1332 | John Phillip, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/19 | 82–1343 | Charles Edward Schneider, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/19 | 82–1344 | Anthony J. Corsoniti, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/19 | 82–1345 | John Klapp, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/19 | 82–1346 | Timothy Franklin, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/19 | 82–1347 | Gary Turbin, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/19 | 82–1348 | Marc E. Wasserman, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/19 | 82–1349 | Harold Kapkin, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/19 | 82–1350 | Thomas Lavin, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/19 | 82–1351 | Thomas Browning, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/19 | 82–1352 | Kenneth Gauthier, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/22 | 82–1359 | Valerie Taylor, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/22 | 82–1360 | Charles Wilfert, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/22 | 82–1361 | Arthur Warriner, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/22 | 82–1362 | Robert M. Lind, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/22 | 82–1363 | John Saunders, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/23 | 82–1366 | Thomas Radd, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/23 | 82–1367 | Wayne Alan Barnett, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11/29 | 82–1387 | Norman C. Mattos, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 12/9 | 82–1446 | Terry Lee Mathis, et al vs. Merrell National Labs |
| 1/20 | 83–106 | Raymell Rayford Hines, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 1/20 | 83–107 | Patricia Eileen Connell, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 1/25 | 83–120 | Ralph E. Sabatini, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 1/25 | 83–121 | Donald Robert Drechsler, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 1/31 | 83–160 | Diane Roth Crow, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 1/31 | 83–161 | Giorgio DiCostanzo, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 2/8 | 83–190 | Frederick Gunsch, Jr., et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |

SDO – CASES

| | | |
|---|---|---|
| 2/10 | 83–215 | Joseph J. Gaworecki, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 2/17 | 83–247 | Roy Smith, Jr., et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 2/25 | 83–304 | Tambria Alvoid, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 2/25 | 83–305 | Carole Hill Wouters, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 3/11 | 83–373 | Mark Fredrick Gorden, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 3/11 | 83–374 | Rosemary O'Rourke, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 3/11 | 83–375 | Catherine Sue Longden, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 3/11 | 83–376 | Ernest David Jones, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 3/14 | 83–384 | Ronald Curtis Sprague, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 3/31 | 83–465 | Leon Harris Miller, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 3/31 | 83–466 | Charles Warren McIntire, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 3/31 | 83–467 | David George Schuepbach, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/11 | 83–530 | Marie L. Gutierrez, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/11 | 83–531 | Philip Joseph Moloney, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/11 | 83–532 | Debbie L. Peterson, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/11 | 83–533 | James E. Hannan, Sr., et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/19 | 83–585 | Robert Slusser, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/19 | 83–586 | Stephen E. Rowe, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/19 | 83–587 | Joseph Hunt, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/19 | 83–588 | Michael E. Smith, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/19 | 83–589 | Kenneth M. Toughy, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/19 | 83–590 | Douglas B. Reddin, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/19 | 83–591 | Eugene Spencer, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/19 | 83–592 | Jane Bishin, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/19 | 83–593 | Lyle A. Wallace vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/19 | 83–594 | Nelson Tuttle, Jr., et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/20 | 83–599 | Joseph Paxton, III, et al vs Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/20 | 83–600 | David C. Sharp, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/20 | 83–601 | William F. McLaughlin, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/20 | 83–602 | Paul Schwenger, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/20 | 83–603 | Mark R. Savage, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/20 | 83–604 | Enrique Martinez, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |

SDO – CASES

| | | |
|---|---|---|
| 4/20 | 83–605 | David Parker, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/20 | 83–606 | Valeri Johnson, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/20 | 83–607 | Mabel D. Saulny, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 4/20 | 83–608 | Thomas D. Wright, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/4 | 83–700 | Roger J. Cook, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/6 | 83–707 | Louis David Ellis, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/6 | 83–708 | Michael C. Hills, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/6 | 83–709 | James McGarry, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/6 | 83–710 | Leslie J. Figuero, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/6 | 83–711 | Karen D. Giovannetti, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/6 | 83–712 | Jean M. Dotson, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/6 | 83–713 | Kathleen A. Perrelli, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/6 | 83–714 | Denise S. Lawrence, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/6 | 83–715 | Robert D. Silver, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/10 | 83–726 | James V. Leach, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/10 | 83–727 | Bing W. Cherry, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/31 | 83–810 | Kim Lee Widmer, et al vs. Merrell Dow Pharmaceuticals, Inc. et al |
| 5/31 | 83–811 | Stephen Morton Pearson, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/31 | 83–812 | James Scott Cooper, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/31 | 83–813 | Albert Garcia, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/31 | 83–814 | Charles Thomas House, Jr., et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/31 | 83–815 | Tracey Butler Smith, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 5/31 | 83–816 | Ronald E. Butler, Sr., et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 6/13 | 83–864 | Gary Norman Hoopes, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 6/30 | 83–981 | Paul M. Chance, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 7/12 | 83–1012 | Philip W. Spence, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 7/12 | 83–1013 | Cholya D. Clark, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 7/12 | 83–1014 | Steven W. Rhea, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 7/12 | 83–1015 | Donna L. Carrow, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 7/12 | 83–1016 | Jeannette Wilson, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 7/12 | 83–1017 | Said Davoudian, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 7/12 | 83–1018 | John R. Noe, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |

SDO – CASES

| | | |
|---|---|---|
| 7/12 | 83–1019 | James A. Gilbert vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 7/12 | 83–1022 | Dennis L. Valentine vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/3 | 83–1185 | Phillip Blasmo, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/3 | 83–1186 | Charles W. Hubbard, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/3 | 83–1187 | Charles T. Robinson, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/3 | 83–1188 | Mark Thomas Reyland, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/3 | 83–1189 | Carlo Buoninfante, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/3 | 83–1190 | Glen C. Wright, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/3 | 83–1191 | Ramesh Jain, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/10 | 83–1240 | Lawrence E. Meyers, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/10 | 83–1246 | Stephen S. Rauh, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/10 | 83–1247 | Steven Paul George, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/10 | 83–1248 | Scott D. Hostetler, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/10 | 83–1249 | Donald E. Simpkins, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/26 | 83–1339 | Alfred Lamb, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/26 | 83–1340 | Jose Castro, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/26 | 83–1341 | John J. Antle, Jr., et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/26 | 83–1342 | Earl B. Ford, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/26 | 83–1343 | Gerald V. Speed, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/26 | 83–1344 | Peter J. Martin, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/26 | 83–1345 | Robert B. Marshall, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/31 | 83–1362 | Terry D. Becker, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/31 | 83–1363 | Henry A. Kanguas, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/31 | 83–1364 | Randall A. White, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/31 | 83–1365 | George Paich, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/31 | 83–1367 | Richard F. Stineman, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/31 | 83–1368 | Rodolfo G. Vaquera, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/31 | 83–1369 | Gerard J. Davidse, II, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 8/31 | 83–1370 | Terry Lawson, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/9 | 83–1436 | Larry James C. Thompson, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/9 | 83–1437 | Neil Frazer Mactavish, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/9 | 83–1438 | Peter J. Sargent, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/9 | 83–1439 | Karen Brenda Matz, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/14 | 83–1474 | Daniel E. Behrens, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |

SDO – CASES

| | | |
|------|---------|---|
| 9/15 | 83–1477 | Anton J. Horowitz, Sr., et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/15 | 83–1478 | Clarence H. Gunter, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/15 | 83–1479 | John W. Williams, II, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/15 | 83–1480 | Forrest T. Trantham, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/15 | 83–1481 | Philip G. Shoop, Jr., et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/15 | 83–1482 | Robert A. Griffin, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/15 | 83–1483 | Candace J. Haven, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/15 | 83–1484 | Robert Rosenblum, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/15 | 83–1485 | James D. Younger, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/15 | 83–1486 | Jeffrey Hughes, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 9/19 | 83–1527 | George Radvansky, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10/3 | 83–1621 | Jay Hanan Kline, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10/3 | 83–1622 | Debbie Louis Peterson, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10/3 | 83–1623 | Melvin K. Smith, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10/3 | 83–1624 | James W. Johnson, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10–3 | 83–1625 | Michael L. Wright, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10–12 | 83–1673 | Roxanne C. Frett, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10–12 | 83–1674 | Kevin V. Jobe, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10–12 | 83–1675 | William F. Pickard, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10–24 | 83–1711 | Larry C. Keyser, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10–24 | 83–1712 | William Rix, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 10–24 | 83–1713 | Randall Weber, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11–7 | 83–1800 | Michael Sanstra, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11–7 | 83–1801 | Ronald Mason, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11–7 | 83–1802 | Robert Mathews, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11–7 | 83–1803 | Gail Lynn Craycraft, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |
| 11–7 | 83–1804 | Ronnie D. Ashley, et al vs. Merrell Dow Pharmaceuticals, Inc., et al. |

**NAME OF JUROR**

**MARK A "YES" OR "NO" BOX FOR EACH QUESTION** YES NO

1. ARE YOU A CITIZEN OF THE UNITED STATES?

2. ARE YOU 18 YEARS OF AGE OR OLDER?
 GIVE YOUR AGE

3. HAVE YOU LIVED FOR THE PAST FULL YEAR

 IF "NO" SHOW UNDER REMARKS ON REVERSE THE NAMES OF OTHER COUNTIES OR STATES IN WHICH YOU LIVED DURING THE YEAR AND SHOW DATES

 IN THIS STATE, IN THE SAME COUNTY?

4. DO YOU READ, WRITE, SPEAK AND UNDERSTAND THE ENGLISH LANGUAGE?

5. HAVE YOU EVER BEEN CONVICTED, EITHER BY YOUR GUILTY OR NOLO CONTENDERE PLEA OR BY A COURT OR JURY TRIAL, OF A STATE OR FEDERAL CRIME FOR WHICH PUNISHMENT COULD HAVE BEEN MORE THAN ONE YEAR IN PRISON?

IF YOUR ANSWER TO NO. 5, 6 OR 7 IS "YES" PLEASE GIVE MORE INFORMATION ON REVERSE SIDE.

6. (IF "YES") WERE YOUR CIVIL RIGHTS RESTORED?(IF "YES", EXPLAIN ON REVERSE SIDE)

7. ARE ANY CHARGES NOW PENDING AGAINST YOU FOR A VIOLATION OF STATE OR FEDERAL LAW PUNISHABLE BY IMPRISONMENT FOR MORE THAN ONE YEAR?

8. DO YOU HAVE ANY PHYSICAL OR MENTAL DISABILITY THAT WOULD INTERFERE WITH OR PREVENT YOU FROM SERVING AS A JUROR? (IF "YES", EXPLAIN UNDER REMARKS ON REVERSE)

9. 

| | | | |
|---|---|---|---|
| HOME | | WORK (INCL. EXTENSION) | |
| AREA CODE | NUMBER | AREA CODE | NUMBER & EXT. |

PHONE

10. PLEASE SHOW YOUR RACE BELOW (SEE NOTE ON REVERSE SIDE)

 BLACK (NEGRO): □HISPANIC □ NON-HISPANIC
 WHITE: □HISPANIC □NON-HISPANIC
 AMERICAN INDIAN
 ORIENTAL
 OTHER (Specify)

ARE YOU NOW EMPLOYED? □ NO □ YES

YOUR USUAL OCCUPATION, TRADE OR BUSINESS

YOUR EMPLOYER'S NAME

BUSINESS OR EMPLOYER'S ADDRESS

11. SHOW THE EXTENT OF YOUR EDUCATION BY GIVING THE NUMBER OF YEARS COMPLETED ABOVE GRADE SCHOOL

 In High School
 Above High School
 Trade/Vocational School

YOU MUST ANSWER ALL QUESTIONS THAT APPLY TO YOU

15. I declare under penalty of perjury that all answers are true and correct to the best of my knowledge and belief

 MR □ MRS. □ MISS □

SIGN HERE

**FROM** RETURN THIS FORM IN THE ENCLOSED ENVELOPE TO: UNITED STATES DISTRICT COURT

DATE

17.

18.

13. **EXCEPTIONS** YES NO

ARE YOU EMPLOYED ON A FULL TIME BASIS AS A:

PUBLIC OFFICIAL OF THE UNITED STATES, STATE, OR LOCAL GOVERNMENT WHO IS ELECTED TO PUBLIC OFFICE OR DIRECTLY APPOINTED BY ONE ELECTED TO OFFICE.

MEMBER OF ANY GOVERNMENTAL POLICE OR REGULAR FIRE DEPT. (NOT INCLUDING VOLUNTEER OR NON-GOVERNMENTAL DEPARTMENTS)

MEMBER IN ACTIVE SERVICE OF THE ARMED FORCES OF THE UNITED STATES.

14. **GROUNDS FOR REQUEST**

PART 2 OF THE ATTACHED LETTER OF INSTRUCTIONS DESCRIBES CERTAIN CATEGORIES OF PERSONS WHO MAY BE EXCUSED BY THE COURT FROM SERVICES AS A JUROR. IF YOU ARE A PERSON IN ONE OF THESE CATEGORIES AND YOU WISH TO BE EXCUSED WRITE THE NUMBER OF YOUR CATEGORY HERE 14

OR, IF YOU WISH TO SERVE DO NOT SHOW ANYTHING HERE. PERSONS SHOWING A CATEGORY OF EXCUSE WHICH REQUIRES MORE INFORMATION MUST GIVE IT ON THE OTHER SIDE UNDER "REMARKS"

TO

IF ANOTHER PERSON FILLED OUT THIS FORM PLEASE GIVE YOUR NAME AND ADDRESS ON THE OTHER SIDE OF FORM AND EXPLAIN THE REASON YOU GAVE ASSISTANCE OFFICIAL USE ONLY

IF YOUR NAME OR PERMANENT ADDRESS IS NOT CORRECT. PLEASE CHECK □ AND SHOW CORRECTIONS ON REVERSE

COUNTY YOU NOW LIVE IN

PLEASE READ LETTER AND OTHER SIDE

JUROR QUALIFICATION QUESTIONNAIRE. PRINT OR TYPE YOUR ANSWERS

## APPENDIX C

*Potential Juror Questionaire*

*Instructions:*

You may become a juror in the trial of the Bendectin litigation. The attached questions require answers. They will assist the selection of a jury to hear this case.

Please answer all of the questions to the best of your ability. Do not ask for help.

We need you to answer honestly so that we may select a fair and impartial jury. Do not assume that any of your answers will qualify you or disqualify you from serving on this jury.

Please print your answers clearly in black ink.

If you cannot answer a question because you do not understand it or do not know the answer, please write in "Do Not Under-stand" or "Do Not Know" in the space provided for the answer. If you want to explain your answer and there is not enough room to do this in the space provided for the answer, please write in the margin next to the questions.

Beginning now please do not watch any TV program, listen to any radio programs or read any articles concerning Bendectin, or discuss it with anyone unless you are excused from jury duty in this case.

Please do not attempt to learn anything about Bendectin. Your cooperation and help is very much appreciated.

S/ Carl B. Rubin
Carl B. Rubin,
Chief Judge
United States
District Court

POTENTIAL JUROR QUESTIONAIRE

1. FULL NAME: _____
2. ADDRESS: _____

3. DATE OF BIRTH: _____
4. ARE YOU CURRENTLY (Check One)
 MARRIED _____ SINGLE _____
 DIVORCED _____ SEPARATED _____ WIDOWED _____

EMPLOYMENT

5. ARE YOU CURRENTLY EMPLOYED: _____
6. NAME OF CURRENT EMPLOYER: _____
7. DESCRIBE YOUR CURRENT OCCUPATION: _____

8. HAS YOUR OCCUPATION CHANGED IN THE LAST 10 YEARS?
 Yes _____ No _____
9. IF "YES", WHAT WAS YOUR PRIOR OCCUPATION?

10. HAVE YOU EVER WORKED FOR AN INSURANCE COMPANY?
 Yes _____ No _____
 A. IF SO, DESCRIBE YOUR JOB: _____

11. HAVE YOU EVER DONE ANY CLAIMS ADJUSTMENT WORK FOR ANY EMPLOYER? _____
12. IF YOU HAVE EVER BEEN EMPLOYED BY ANY OF THE FOLLOWING COMPANIES OR AGENCIES, PLEASE PLACE A CHECK MARK BEFORE THE NAME OF THE COMPANY OR AGENCY:
 _____ MERRELL DOW PHARACEUTICALS, INC.
 _____ DOW CHEMICAL COMPANY
 _____ WILLIAM S. MERRELL COMPANY
 _____ MERRELL NATIONAL LABORATORIES
 _____ RICHARDSON–MERRELL, INC.

RICHARDSON–VICKS, INC.
FOOD AND DRUG ADMINISTRATION (FDA)

EDUCATION

13. DID YOU GRADUATE FROM HIGH SCHOOL: _____
 A. IF YOU DID NOT GRADUATE FROM HIGH SCHOOL, HOW MANY YEARS OF SUCH DID YOU COMPLETE: _____
14. IF YOU ATTENDED TRADE SCHOOL, NAME THE TRADE SCHOOL YOU ATTENDED: _____
15. IF YOU ATTENDED COLLEGE, NAME THE COLLEGE YOU ATTENDED: _____
16. IF YOU GRADUATED FROM COLLEGE, DESCRIBE THE DEGREE YOU RECEIVED: _____
17. IF YOU ATTENDED GRADUATE SCHOOL, NAME THE GRADUATE SCHOOL ATTENDED: _____
18. IF YOU RECEIVED A GRADUATE DEGREE, DESCRIBE YOUR DEGREE: _____
 18. A. DO YOU HAVE PLANS TO CONTINUE YOUR EDUCATION: __

FAMILY INFORMATION

19. NAME OF SPOUSE: _____
20. AGE OF SPOUSE: _____
21. SPOUSE'S CURRENT EMPLOYER: _____
22. SPOUSE'S CURRENT OCCUPATION: _____
23. SPOUSE'S PAST EMPLOYERS: _____
24. SPOUSE'S PAST OCCUPATIONS: _____
25. DO YOU HAVE CHILDREN: _____
 25. A. HOW MANY: _____
 25. B. WHAT ARE THEIR: AGE SEX
 ____ ____
 ____ ____
 ____ ____
 ____ ____
 ____ ____

26. DO ANY OF YOUR CHILDREN HAVE BIRTH DEFECTS: _____
 IF "YES", PLEASE DESCRIBE: _____

27. DO YOU HAVE ANY FRIENDS, RELATIVES OR ACQUAINTANCES WHO HAVE BIRTH DEFECTS: _____
 IF "YES", PLEASE DESCRIBE THEIR RELATIONSHIP TO YOU AND THE NATURE OF THAT DEFECT:

 Relationship Description of the Defect

 _____ _____
 _____ _____
 _____ _____

29. HAS YOUR SPOUSE OR HAVE ANY OF YOUR CHILDREN EVER WORKED FOR AN INSURANCE COMPANY: _____
 IF "YES", IDENTIFY YOUR FAMILY MEMBER WHO HAS DONE SO AND DESCRIBE HIS OR HER JOB: _____

30. HAS YOUR SPOUSE OR HAVE ANY OF YOUR CHILDREN EVER DONE ANY CLAIMS ADJUSTMENT WORK FOR ANY EMPLOYER: ___

IF "YES", IDENTIFY YOUR FAMILY MEMBER WHO HAS DONE SO AND IDENTIFY HIS OR HER EMPLOYER: _____

31. IF ANY OF YOUR FAMILY MEMBERS HAVE EVER BEEN EMPLOYED BY ANY OF THE FOLLOWING COMPANIES OR AGENCIES, PLEASE PLACE A CHECK MARK BEFORE THE NAME OF THE COMPANY OR AGENCY:

_____ MERRELL DOW PHARACEUTICALS, INC.
_____ DOW CHEMICAL COMPANY
_____ WILLIAM S. MERRELL COMPANY
_____ MERRELL NATIONAL LABORATORIES
_____ RICHARDSON–MERRELL, INC.
_____ RICHARDSON–VICKS, INC.
_____ FOOD AND DRUG ADMINISTRATION (FDA)

HEALTH INFORMATION

32. ARE YOU CURENTLY IN GOOD HEALTH: _____

IF "NO", OR IF YOU ARE SUFFERING FROM ANY ILLNESSES OR DISABILITIES, PLEASE DESCRIBE:

_____
_____
_____

33. IS YOUR HEARING IMPAIRED: _____
IF "YES", PLEASE DESCRIBE YOUR IMPAIRMENT: _____

_____

34. DO YOU SUFFER FROM AN IMPAIRMENT OF YOUR EYESIGHT THAT IS NOT CORRECTABLE BY WEARING GLASSES: _____
IF "YES", PLEASE DESCRIBE YOUR IMPAIRMENT: _____

_____

35. CAN YOU READ AND WRITE WITHOUT DIFFICULTY: _____
IF "NO", PLEASE DESCRIBE YOUR IMPAIRMENT: _____

_____

INFORMATION ABOUT YOUR KNOWLEDGE OF THIS CASE AND YOUR FEELINGS ABOUT THIS CASE

36. HAVE YOU OR ANY OF YOUR FAMILY MEMBERS EVER BEEN PRESCRIBED BENDECTIN, TAKEN BENDECTIN, OR IN ANY WAY BEEN INVOLVED WITH BENDECTIN:

_____

IF "YES", PLEASE IDENTIFY THE FAMILY MEMBER(S) AND DESCRIBE THEIR EXPERIENCES OR INVOLVEMENT AND YOUR OWN:

_____
_____
_____

37. HAVE YOU FORMED ANY OPINIONS OR DO YOU HAVE ANY STRONG FEELINGS REGARDING BENDECTIN: _____
IF YES, PLEASE DESCRIBE YOUR OPINIONS OR FEELINGS:

_____
_____
_____

38. HAVE YOU FORMED ANY OPINIONS OR DO YOU HAVE ANY STRONG FEELINGS REGARDING BENDECTIN AND BIRTH DEFECTS:

_____

IF "YES", PLEASE DESCRIBE YOUR OPINIONS OR STRONG FEEL-INGS:

_____
_____
_____

39. THIS CASE ALSO INVOLVES ISSUES OF CHILD DEVELOPMENT AND PREGNANCY. WOULD YOU CONSIDER THE FOLLOWING ACTIVI-TIES TO BE SAFE FOR PREGNANT WOMEN:

| Activities | Yes | No | Don't Know |
|---|---|---|---|
| -Drinking Coffee | _____ | _____ | _____ |
| -Engaging in mild exercise | _____ | _____ | _____ |
| -Taking aspirins | _____ | _____ | _____ |
| -Taking medication | _____ | _____ | _____ |
| -Traveling in airplanes | _____ | _____ | _____ |
| -Employment outside the home | _____ | _____ | _____ |
| -Homemaking activities | _____ | _____ | _____ |
| -Smoking cigarettes | _____ | _____ | _____ |
| -Drinking wine or beer | _____ | _____ | _____ |

40. HAVE YOU FORMED ANY OPINIONS OR DO YOU HAVE ANY STRONG FEELINGS REGARDING COMPANIES THAT MANUFACTURE PRESCRIPTION DRUGS: _____ (Yes) _____ (No)

40.A. IF "YES", PLEASE DESCRIBE YOUR OPINIONS OR STRONG FEELINGS:

_____
_____

41. THE CASE YOU ARE GOING TO BE HEARING INVOLVES TESTIMONY CONCERNING AN AGENCY OF THE FEDERAL GOVERNMENT KNOWN AS THE FOOD AND DRUG ADMINISTRATION, OR FDA. WHAT IS YOUR OPINION REGARDING THE FDA'S PERFORMANCE OF ITS RESPONSI-BILITIES:

Excellent ——
Good ——
Fair ——
Poor ——
No Opinion ——

42. HAVE YOU EVER BEEN A WITNESS AT A TRIAL:
_____ (Yes) _____ (No)

42.A. IF "YES", PLEASE DESCRIBE YOUR EXPERIENCES:

_____
_____

43. HAVE YOU EVER BEEN A JUROR BEFORE IN A TRIAL:
_____ (Yes) _____ (No)

43.A. IF "YES", HOW MANY WERE CRIMINAL TRIALS: _____

43.B. IF "YES", HOW MANY WERE CIVIL TRIALS: _____

43.C. IF YOU WERE A JUROR IN A CIVIL TRIAL, WHAT WAS THE MOST RECENT TRIAL ABOUT:

_____

43.D. IF YOU WERE A JUROR IN A CIVIL TRIAL, IN THE MOST RECENT TRIAL DID THE JURY DELIBERATE:

_____ (Yes) _____ (No)

43.E. IF YOU WERE A JUROR IN A CIVIL TRIAL, IN THE MOST RECENT TRIAL, DID THE JURY REACH A VERDICT:

_____ (Yes) _____ (No)

1. IF "YES", WHAT WAS THE VERDICT: _____

44. HAVE YOU OR ANY MEMBER OF YOUR FAMILY EVER SUED ANYONE FOR MONEY IN COURT: _____ (Yes) _____ (No)

44.A. IF "YES", WHAT WAS THE CASE ABOUT: _____

44.B. IF "YES", HOW DID THE CASE END: _____

_____

44.C. WOULD THAT OUTCOME AFFECT YOUR ABILITY TO BE A FAIR AND IMPARTIAL JUROR IN THIS CASE:

_____ (Yes) _____ (No)

1. IF "YES", TELL WHY: _____

_____

45. HAVE YOU OR ANY MEMBER OF YOUR FAMILY EVER BEEN SUED BY ANYONE: _____ (Yes) _____ (No)

45.A. IF "YES", WHAT WAS THE CASE ABOUT: _____

45.B. HOW DID THE CASE END: _____

_____

45.C. WOULD THAT OUTCOME AFFECT YOUR ABILITY TO BE A FAIR AND IMPARTIAL JUROR IN THIS CASE:

_____ (Yes) _____ (No)

1. IF "YES", TELL WHY: _____

_____

46. WILL YOU BE ABLE TO FOLLOW THE LEGAL INSTRUCTIONS GIVEN TO YOU BY THE COURT REGARDLESS OF YOUR PERSONAL FEELINGS AS TO WHAT THE LAW SHOULD BE: (Check One)
( ) YES
( ) NO
( ) I DON'T KNOW

THANK YOU FOR YOUR TIME AND ASSISTANCE!

X_____
(Please sign your name on this line.)

In Re: Bendectin Litigation

Civil No. MDL #486

March, 1985

## INDEX

### I. GENERAL

Duties of the Jury ............... 1263
Preponderance of the Evidence ..... 1263
Evidence ........................ 1263
Evidence—Direct and Circumstantial 1264
Witnesses ....................... 1264
Expert Witnesses ................. 1264
Expert Witnesses—Compensation ... 1264
Opinion Witnesses ................ 1264
Scope of Cross Examination ........1265
Depositions—Form of Testimony ...1266
All Persons Equal Before the Law .1266
Witness Advance Consultation with
 Counsel ....................... 1266
Drawings, Diagrams and Displays ..1266

### II. CAUSATION

Claims of the Parties ............ 1266
"Organogenesis"—Definition ...... 1266
"Birth Defects"—Definition ....... 1267
"Causation"—Definition .......... 1267
Consideration of the Evidence ..... 1267

### III. VERDICT

Unanimous Verdict ............... 1268
No Recommended Verdict .......... 1268
Jury Question ................... 1268
Form of Verdict ................. 1268
Jury—Final Instructions .......... 1269
Miscellaneous ................... 1269

## DUTIES OF THE JURY

Ladies and Gentlemen:

I am now going to tell you the laws that apply to this case. As jurors you have two major duties.

*First,* you must look at the evidence and decide from that evidence what the facts in this case are. It is your job and no one else's to decide what the facts are.

*Second,* you must listen to the laws that I am about to explain and you must follow all of them in order to reach your verdict.

In fulfilling these duties you must not be influenced by your feelings of sympathy or prejudice.

## PREPONDERANCE OF THE EVIDENCE

Lawsuits such as this are begun by the filing of a Complaint. The person who files is known as the plaintiff. A plaintiff must prove all claims by a preponderance of the evidence. If this is not done, then you should find for the defendant. This obligation is known as "the burden of proof."

To establish something by a "preponderance of the evidence" means simply to prove that something is more likely to be so than not so.

We deal in probabilities, not possibilities. Speculation or guesswork are not enough.

The test is not which side brings the greater number of witnesses or who produces the greater quantity of testimony, but which side produces those witnesses and that evidence which in your minds are the more accurate and trustworthy.

## EVIDENCE

I mentioned earlier that it is your job to decide from the evidence what the facts are. Here are some rules that will help you decide what is and what is not evidence.

1. LAWYER'S STATEMENTS: Statements made by lawyers in opening statements or final argument are not evidence. If the lawyers all agree that some particular thing is true, you must accept it as true.

2. REJECTED EVIDENCE: At times during this trial exhibit items or testimony were offered as evidence but I did not allow them to become evidence. Since they never became evidence, you must not consider them.

3. STRICKEN EVIDENCE: At times I ordered some piece of evidence or testimony to be stricken or eliminated. Since they are no longer evidence, you must not consider them either.

4. OUT–OF–COURT KNOWLEDGE: Anything that you have seen or heard outside of the courtroom is not evidence and must not be considered by you.

## EVIDENCE—DIRECT AND CIRCUMSTANTIAL

There are, generally speaking, two different types of evidence. One is direct evidence—such as the testimony of an eyewitness. The other is indirect or circumstantial evidence—the proof of a chain of circumstances pointing to the existence or nonexistence of certain facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence. You should find the facts in accordance with all the evidence in the case, both direct and circumstantial.

## WITNESSES

You must decide which testimony to believe and which testimony not to believe. In deciding what to believe, you may consider the conduct of a witness on the witness stand, any interest that witness may have in the outcome of the case, and any relationship to any of parties involved.

You may also consider differences, if any, in testimony of a witness when testifying on direct examination and when testifying on cross-examination. You may note the ability of a witness to remember events or not remember; and you may consider whether contradictions or differences in testimony concern an important fact or only a small detail.

You may believe all that a witness told you; you may believe none of what a witness told you; or you may believe any part. You are not, of course, bound to believe something merely because someone swore to it, because you all know that a person can swear to an untruth if there is the will to do so.

## EXPERT WITNESS

You have heard testimony from persons who were described as experts.

A person who by knowledge, skill, experience, training or education has become expert[1] in some field, may state an opinion on matters in that field and may also state reasons for that opinion.

Expert testimony should be considered by you like any other testimony. You may accept it or reject it, or give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.[2]

Whether the parties agreed that a witness is an expert or disagreed by inquiring into a witness's qualification is not binding upon you.

## COMPENSATION OF EXPERT WITNESSES

During the trial, expert witnesses were asked if they had been or would be compensated for their expert services.

It is not improper for an expert witness to be compensated for services. It is a customary and accepted procedure. No possible suggestion or impropriety results from compensation for the services of an expert witness, including compensation for giving testimony at trial.

## OPINION WITNESSES

Testimony was given in this case by nineteen witnesses all of whom gave opinions.

---

**1.** Rule 702 Fed.R.Evi.

**2.** Pattern Jury Instructions (9th Cir. 4.16)

To assist you in recalling them, the following list includes names, specialties and dates of testimony of each witness.

## PLAINTIFFS' WITNESSES

NAME: Dr. Stuart A. Newman
SPECIALTY: Cellular Biology
DATE(S) TESTIFIED: February 4, 5

NAME: Dr. Alan K. Done
SPECIALTY: Pharmacology and Toxicology
DATE(S) TESTIFIED: February 5–7

NAME: Dr. William G. McBride
SPECIALTY: Obstetrics and Gynecology
DATE(S) TESTIFIED: February 11

NAME: Dr. Shanna Helen Swan
SPECIALTY: Epidemiology
DATE(S) TESTIFIED: February 11–13

NAME: Dr. Michael Melnick
SPECIALTY: Genetics and Craniofacial Biology

DATE(S) TESTIFIED: February 13–15

NAME: Dr. Johannes Bernard Thiersch
SPECIALTY: Pathology
DATE(S) TESTIFIED: February 19–20

NAME: Dr. Mark Thoman
SPECIALTY: Toxicology and Pharmacology

DATE(S) TESTIFIED: February 19

NAME: Dr. Frederick Crescitelli
SPECIALTY: Biology and Physiology
DATE(S) TESTIFIED: February 15, 19

## DEFENDANT'S WITNESSES

NAME: Dr. Brian MacMahon
SPECIALTY: Epidemiology
DATE(S) TESTIFIED: February 21–22

NAME: Dr. William J. Scott, Jr.
SPECIALTY: Veterinary Medicine, Teratology and Anatomy

DATE(S) TESTIFIED: February 22, 25

NAME: Dr. James W. Newberne
SPECIALTY: Veterinary Medicine and Pathology
DATE(S) TESTIFIED: February 25, 26

NAME: Dr. James L. Goddard
SPECIALTY: Public Health
DATE(S) TESTIFIED: February 26, 27

NAME: Dr. Michael B. Bracken
SPECIALTY: Epidemiology
DATE(S) TESTIFIED: February 27–28

NAME: Dr. Bryan D. Hall
SPECIALTY: Pediatrics, Genetics and Dysmorphology

DATE(S) TESTIFIED: March 4–5

NAME: Dr. Lewis B. Holmes
SPECIALTY: Pediatrics, Teratology, Genetics and Dysmorphology
DATE(S) TESTIFIED: March 5

NAME: Dr. Peter St. John Dignan
SPECIALTY: Pediatrics, Genetics and Dysmorphology
DATE(S) TESTIFIED: March 5–6

NAME: Dr. Clarence R. McLain, Jr.
SPECIALTY: Obstetrics and Gynecology
DATE(S) TESTIFIED: March 6

## PLAINTIFFS' REBUTTAL WITNESSES

NAME: Dr. Vladimir Petrov
SPECIALTY: Pharmacology
DATE(S) TESTIFIED: March 7

NAME: Dr. David J. Brusick
SPECIALTY: Biology
DATE(S) TESTIFIED: March 6

## SCOPE OF CROSS–EXAMINATION

Each witness is subject to direct examination by the party who calls him and to cross-examination by the opposite party. During cross-examination counsel may inquire into matters that are not material to the issues. Such questions and answers

▬▬▬▬▬

are permitted for the purpose of helping you to determine the weight to be given to the testimony of the witnesses and for no other purpose. On cross-examination, other than questions and answers for the purpose of determining the weight to be given to the testimony of the witness, opposing counsel may not go outside the scope of questions asked on direct examination.

## DEPOSITIONS

Some evidence has been presented to you by written deposition and by tape. The form of testimony has no bearing upon its weight. All testimony whether spoken or written or taped must be accorded equal validity. Treat the deposition evidence both written and taped as though the witness were present in the courtroom.

## ALL PERSONS EQUAL BEFORE THE LAW

The fact that the plaintiffs are individuals and defendant is a corporation must not enter into or affect your verdict. This case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. A corporation is entitled to the same fair trial at your hands as a private individual. The law is no respector of persons; all persons, including corporations, stand equal before the law, and are to be dealt with as equals in a court of justice.

## WITNESS ADVANCE CONSULTATION WITH COUNSEL

During this trial various witnesses have been asked if counsultation with counsel had occurred before that witness's appearance in court.

It is not improper for an attorney to interview a witness before he testifies. It is a customary and accepted procedure. No possible suggestion of impropriety results from an interview alone.

## DRAWINGS, DIAGRAMS AND DISPLAYS

As a technique to explain and summarize testimony and evidence both parties have used drawings, diagrams and displays of pertinent items. These are known as "demonstrable evidence" and are acceptable techniques of presentation. Such drawings, diagrams and displays are not evidence in and of themselves. It is only the materials upon which they are based that are evidence.

If any of the items used are not in your opinion accurate or differ from your recollection of the testimony and evidence, you may disregard all or any part of the drawings, diagrams and displays and rely instead upon your recollections.

## CLAIMS OF THE PARTIES

The plaintiffs claim that Bendectin, when taken in therapeutic amounts during the period of organogenesis, is a teratogen, and that Bendectin, as a teratogen, may cause the following types of birth defects: musculoskeletal defects, central nervous system defects, heart defects; head deformities, respiratory defects; gastrointestinal defects; genitourinary defects; and death, including spontaneous abortions, stillbirths and neonatal deaths resulting from defects or deformities inconsistent with life.

Defendant denies that ingestion of Bendectin as prescribed causes any type of birth defect or death in humans.

The foregoing are simply "claims" of the parties. They do not constitute any conclusion by the Court.

## "ORGANOGENESIS"—DEFINITION

While a woman is pregnant, the organs and structures of the fetus undergo development. This period of development is termed organogenesis.

Stedman's Medical Dictionary
5th Edition 1982 p. 993

## "BIRTH DEFECTS"—DEFINITION

There are eight categories of birth defects to be considered. It is not necessary that you find that the ingestion of Bendectin caused all of the malformations listed in a category to find that Bendectin causes a particular category of birth defects. Instead, you must find that ingestion of Bendectin at therapeutic doses caused a defect in a specific category.

The categories are:

1. *Musculoskeletal Defects:* Defects in the muscles, bones and cartilage of a child, including limb defects.

2. *Central Nervous System Defects:* Defects in the brain, spinal cord and nerves.

3. *Heart Defects:* Defects in the heart and circulatory system.

4. *Head Defects:* Defects in the head and face.

5. *Respiratory Defects:* Defects in the larynx, trachea, bronchi, and lungs.

6. *Gastrointestinal Defects:* Defects in the esophagus, stomach and intestines.

7. *Genitourinary Defects:* Defects in the reproductive organs, kidneys, ureters, urethra, and bladder.

8. *Death:* Includes spontaneous abortions, stillbirths, and neonatal deaths resulting from life-threatening birth defects.

## CAUSATION—DEFINITION

The question you must answer is whether the plaintiffs established by a preponderance of the evidence that the ingestion of Bendectin at therapeutic doses during the period of fetal organogenesis is a proximate cause of birth defects?

The term "proximate cause" is defined as that which in a natural and continuous sequence produces an injury that would not have otherwise occurred.[1]

This does not mean that the law recognizes only one proximate cause of an injury. Thee may be more than one proximate cause. There may be other factors that operate at the same time, either independently or together, to cause an injury. In such a case, each factor may be a proximate cause.[2]

In order to conclude that Bendectin in therapeutic doses caused a specific category of birth defects, it is not necessary for you to find that all women who ingested Bendectin delivered children with birth defects.

The ingestion of Bendectin by a pregnant women in therapeutic doses and the subsequent delivery of a child with a specific birth defect standing alone is not evidence that Bendectin caused that defect.[3]

At all times in your deliberations on causation, you must assume that Bendectin was ingested only in doses prescribed by physicians.

## CONSIDERATION OF THE EVIDENCE

In your consideration of the evidence you may find one of the following three situations.

*One:* It is more likely than not that the ingestion of Bendectin at therapeutic doses during the period of fetal organogenesis is a proximate cause of birth defects.

In this situation, the plaintiffs have met their burden of proof.

*Two:* It is more likely than not that the ingestion of Bendectin at therapeutic doses during the period of fetal organogenesis is not a proximate cause of birth defects.

1. *Strothers v. Hutchinson,* 67 Ohio St.2d 282, 287 [423 N.E.2d 467] (1981). See *Bier v. New Philadelphia,* 11 Ohio St.3d 134, 135 [464 N.E.2d 147] (1984); *Cann v. First National Bank,* 503 F.Supp. 419, 439 (N.D.Ohio 1980), *aff'd,* 669 F.2d 415 (6th Cir.1982).

2. *Gibson v. Erie-Lackawanna R. Co.,* 378 F.2d 476 (6th Cir.1967); *Thomas v. Goodies Ice Cream Co.,* 13 Ohio App.2d 67, 70 [233 N.E.2d 876] (1968); O.J.I. § 11.10; 39 O.Jur.2d 536. See *Springsteel v. Jones & Laughlin Steel Corp.,* 2 Ohio App.2d 353 [192 N.E.2d 81] (1963).

3. *Hasler v. United States,* 718 F.2d 202 (6th Cir. 1983).

In this situation, the plaintiffs have not met their burden of proof.

*Three:* The evidence is equally divided.

In this situation, plaintiffs have not met their burden of proof.

When you have reached a decision, turn to "Jury Question" (Instruction 5750) and follow the instructions there.

### UNANIMOUS VERDICT

Your verdict must represent the considered judgment of every juror. It will be necessary that you all agree to a verdict and indicate that agreement by signing the verdict form.

### NO RECOMMENDED VERDICT

I have given you various rules of law to help you reach a just verdict. Some of these rules may or may not apply to this case depending upon what you find to be the facts.

Simply because I have given instructions does not mean that I am giving my opinion. I have no opinion regarding the facts or who should win.

### JURY QUESTIONS

1. Have the plaintiffs established by a preponderance of the evidence that ingestion of Bendectin at therapeutic doses during the period of fetal organogenesis is a proximate cause of human birth defects?

YES __ NO __

If you have unanimously answered "yes," please proceed to Question 2. If you have unanimously answered "no," do not answer Question 2. Use Verdict Form I.

2. Which of the following categories of birth defects have the plaintiffs established by a preponderance of the evidence that ingestion of Bendectin at therapeutic doses during the period of fetal organogenesis proximately caused?

| | | Yes | No |
|---|---|---|---|
| a. | Musculoskeletal Defects | __ | __ |
| b. | Central Nervous System Defects | __ | __ |
| c. | Heart and Circulatory Defects | __ | __ |
| d. | Head Defects | __ | __ |
| e. | Respiratory Defects | __ | __ |
| f. | Gastrointestinal Defects | __ | __ |
| g. | Genitourinary Defects | __ | __ |
| h. | Death | __ | __ |

Use Verdict Form II.

Verdict Form I

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO WESTERN DIVISION

In Re: Bendectin Litigation MDL # 486

VERDICT

We, the Jury, unanimously find in favor of the defendant, Merrell Dow Pharmaceutical, Inc.

_____ _____

Date Foreman

Verdict Form II

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO WESTERN DIVISION

In Re : Bendectin Litigation MDL # 486

VERDICT

We, the Jury, unanimously find in favor of those plaintiffs having the following categories of birth defects:

| A. | Musculoskeletal Defects | Yes____ No____ |
|---|---|---|
| B. | Central Nervous System Defects | Yes____ No____ |
| C. | Heart and Circulatory Defects | Yes____ No____ |
| D. | Head Defects | Yes____ No____ |
| E. | Respiratory Defects | Yes____ No____ |
| F. | Gastrointestinal Defects | Yes____ No____ |
| G. | Genitourinary Defects | Yes____ No____ |
| H. | Death | Yes____ No____ |

_____ _____

Date Foreman

## JURY—FINAL INSTRUCTIONS

When you go to the jury room, it is your duty to discuss the case with the other jurors and reach a verdict. Each of you must decide the case for yourself.

Do not be afraid to change your opinion if you become convinced that it is wrong. But do not give up your honest convictions simply to reach a verdict or because the other jurors have reached a different result.

You are not a partisan, you are not an advocate. You are a judge—an impartial judge of the facts.

Your only interest is to seek the truth from the evidence in this case.

## MISCELLANEOUS

The exhibits and a copy of these instructions will accompany you to the Jury Room.

You will first elect a foreman who will preside over your deliberations and report your verdict to the Court. Aside from the foregoing, the foreman will have no greater nor lesser function than any other juror.

The term "foreman" is a traditional one and does not limit the selection to male members of the jury.

When you have arrived at a verdict, you so advise the Court.

## APPENDIX E

### IN THE UNITED STATES DISTRICT COURT

### FOR THE SOUTHERN DISTRICT OF OHIO

### WESTERN DIVISION

IN RE: RICHARDSON–MERRELL, INC. "BENDECTIN" PRODUCT LIABILITY LITIGATION

MDL # 486

### ORDER

Both parties have raised various pre-trial motions. The purpose of this Order is to memorialize the Court's rulings on these motions. The bulk of these motions consist of Motions to Exclude Evidence or Motions In Limine. Such motions must be considered in light of the admonition of the United States Court of Appeals for the Sixth Circuit that the preferred method for handling questions of admissibility are as they arise in the context of trial. Pre-trial exclusion of broad categories of evidence should rarely be employed. *Sperberg v. Good Year Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir.1974), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975).

Consistent with the above standard, defendant's Motions to Exclude Evidence of Animal Research (doc. no. 1669), Drug Experience Reports (doc. no. 1612), Teratogenicity of Substances Other Than Bendectin Or Its Components (doc. no. 1640), and Studies Not Adhering To A 5% Standard of Statistical Significance (doc. no. 1644) are DENIED. Leave is granted to object to specific portions of the above evidence at trial.

Certain other Motions in Limine are appropriate for pre-trial determination so as to limit the evidence at trial to the narrow issue involved: whether Bendectin causes birth defects. Defendant's Motion to Exclude Evidence of Dr. Nulsen's Non-Bendectin Research (doc. no. 1600) will be GRANTED to the extent all references to the drug Thalidomide must be excised. The remainder of his testimony and research is admissible with leave to make specific objections at trial. Defendant's Motion to Exclude Evidence of Cessation of Production of Bendectin (doc. no. 1591) is GRANTED because that evidence is irrelevant to causation and violative of Fed.R. Evi. 407. Defendant's Motion to Exclude Evidence of Plaintiffs' Aggregate Claims (doc. no. 1641) is GRANTED. Such evidence is irrelevant and has great potential for prejudicing and confusing the jury.

Plaintiffs' Motion to Exclude Evidence of Food & Drug Administration (FDA) Approval of Bendectin (doc. no. 2605) and defendant's Motion to Exclude Evidence of

Violations of FDA Regulations (doc. no. 2582) are GRANTED for the same reasons as doc. no. 1641 above. The trial on causation is not the proper forum to litigate the value of the FDA regulatory process as applied to Bendectin.

Somewhat more complex is defendant's Motion to Exclude Certain Plaintiffs From The Common Issues Trial (doc. no. 1574). Defendant fears that the presence of a large number of children with birth defects in the courtroom during the trial will disrupt the proceedings and arouse the sympathy of the jury thereby prejudicing its case. Plaintiffs counter by arguing that the children have a constitutional right to be present during the trial of their lawsuit.

Plaintiffs' alleged constitutional right is not expressly found in the Constitution. Instead, they derive the right from the Seventh Amendment's grant of the right to trial by jury and the due process clause of the Fourteenth Amendment. Such a derivative right has been recognized by several courts. *See, e.g., Florida Greyhound Lines, Inc. v. Jones,* 60 So.2d 396 (Fla.1952) (plaintiff on stretcher has right to be present); *Carlisle v. Nassau,* 64 App. Div.2d 15, 408 N.Y.S.2d 114 (1978) (paraplegic plaintiff has right to attend jury selection); *Marks v. Mobile Oil Corp.,* 562 F.Supp. 759 (E.D.Pa.1983) (incompetent, spastic plaintiff has right to attend trial when not disruptive.)

This derivative right is not, however, absolute, especially when it conflicts with defendant's constitutional right to a fair trial. *See In Re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). At least two courts have set limits on that right. *See Dickson v. Bober,* 269 Minn. 334, 130 N.W.2d 526 (1964) (incapacitated plaintiff who could not comprehend the proceedings and periodically emitted agonizing groans was excluded from trial); *Morley v. Superior Court of Arizona,* 131 Ariz. 85, 638 P.2d 1331 (1981) (comatose plaintiff excluded from trial).

In many of the above cases, the party's ability to comprehend the proceedings and participate in the presentation of his case were important factors in the Courts' decisions. *See, e.g., Freeman v. Rubin,* 318 So.2d 540, 544 (Fla.App.1975); *Carlisle v. Nassau,* 64 App.Div.2d 15, 408 N.Y.S.2d 114, 117 (App.Div.1978); *Morley v. Superior Court of Arizona,* 131 Ariz. 85, 638 P.2d 1331, 1334 (1981). In the case at bar, presently involving solely the issue of causation, the evidence will consist of the testimony of 19 experts supplemented by various studies, reports, and articles. This highly complex material is totally incomprehensible to young children.

The format of the case also precludes their meaningful participation in the proceedings. Display of their defects is irrelevant to the issue of causation, and they are simply incapable of helping counsel "plan and plot strategy." *Carlisle v. Nassau,* 64 App.Div.2d 15, 408 N.Y.S.2d 114, 117 (1978).

The common thread that links most of the applicable cases is the discretion vested in the trial judge. *See, e.g., Marks v. Mobile Oil Corp.,* 562 F.Supp. 759, 768 (E.D. Pa.1983), *aff'd without opinion,* 727 F.2d 1100 (3d Cir.1984); *Morley v. Superior Court of Arizona,* 131 Ariz. 85, 638 P.2d 1331, 1334 (1981); *Bartholomay v. St. Thomas Lumber Co.,* 148 N.W.2d 278, 285 (N.D.1967); *Dickson v. Bober,* 269 Minn. 334, 130 N.W.2d 526, 530 (1964); *Helfferich v. Farley,* 36 Conn.Supp. 333, 419 A.2d 913, 914 (1980); *Purvis v. Inter-County Telephone & Telegraph Co.,* 203 So.2d 508 (Fla.App.1967) (exclusion depends on degree of impairment). Not only must the trial court conduct a delicate balancing of the parties' interests, it also has a responsibility for the administration of the courtroom and orderly conduct of the trial. *Marks v. Mobile Oil Corp.,* 562 F.Supp. 759, 768 (E.D.Pa.1983). Large numbers of children in the courtroom, healthy or unhealthy, present a serious potential for distraction and disruption. Serious health

problems of many of the plaintiff children compound the problem.

In an effort to balance the legitimate interests of all parties, the Court has made the following determination. A room equipped with closed circuit television will be set aside in the courthouse to accommodate all young children wishing to view the proceedings. In this connection, on February 19, 1985, the following Order was entered by the Court and posted in both elevator lobbies on the Eighth Floor of the United States Courthouse.

IN THE UNITED STATES
DISTRICT COURT

FOR THE SOUTHERN
DISTRICT OF OHIO

WESTERN DIVISION

IN RE:
RICHARDSON–MERRELL, INC.

"BENDECTIN" PRODUCTS

LIABILITY LITIGATION MDL # 486

ORDER

A trial entitled *In Re: Bendectin Litigation* is currently in progress. Adults interested in this trial may either proceed alone to Room 805 or remain with children in Room 828 and view the proceedings through closed circuit television.

Upon request, attendants experienced in dealing with handicapped children will be present in Room 828.

Telephone communication between Room 828 and Plaintiffs' Lead Counsel in Courtroom 805 is available. A representative of Lead Counsel Committee will be in Room 828. Plaintiffs may confer with him and may have their suggestions transmitted to Lead Counsel by such means.

The presence of handicapped children in Courtroom 805 might cause a judgment in favor of plaintiffs to be set aside by a reviewing court.

Accordingly, no child under the age of 10 and no child with visible birth defects, regardless of age, will be permitted in Courtroom 805 during the course of this phase of the trial.

Also pending are two miscellaneous motions. Defendant's Motion to Appoint Dr. Lamm as Court Expert (doc. no. 2336) is DENIED. Defendant's Motion to Quash Subpoenas (doc. no. 2434) is DENIED.

IT IS SO ORDERED.

s/ Carl B. Rubin
Carl B. Rubin,
Chief Judge
United States
District Court

APPENDIX F

**In re RICHARDSON–MERRELL, INC.,**

**Bendectin Products Liability**

**Litigation.**

**MDL No. 486.**

United States District Court,

S.D. Ohio, W.D.

March 22, 1983.

Plaintiffs in action against drug manufacturer sought to compel production of documents. The District Court, Carl B. Rubin, Chief Judge, held that: (1) fact that certain documents were in the hands of defendant's foreign subsidiaries did not bar a discovery; (2) former corporate subdivisions of the defendant which had become part of the defendant were subject to discovery regardless of the form in which they now existed; but (3) plaintiffs were

not entitled to discovery with respect to drugs other than those at issue in the case.

Ordered accordingly.

**1. Federal Civil Procedure ☜1272**

Discovery rules are to be accorded broad and liberal treatment but discovery of matter not presumably calculated to lead to the discovery of admissible evidence is not within the scope of the rules. Fed.Rules Civ.Proc. Rule 26(b)(1), 28 U.S.C.A.

**2. Federal Civil Procedure ☜1634**

Party to civil action could be required, in response to discovery request, to search for documents in the hands of its foreign subsidiaries. Fed.Rules Civ.Proc. Rule 26(b)(1), 28 U.S.C.A.

**3. Federal Civil Procedure ☜1634**

Discoveree cannot avoid proper discovery request by utilizing record keeping which conceals rather than discloses. Fed.Rules Civ.Proc. Rule 26(b)(1), 28 U.S.C.A.

**4. Federal Civil Procedure ☜1632**

Where defendant corporation had undergone series of corporate reorganizations involving itself and subsidiaries, description of parties subject to discovery would be construed to include all former corporate subdivisions, regardless of the form in which they currently existed but would not include documents held by independent corporation and its subsidiaries.

**5. Federal Civil Procedure ☜1274**

In action against drug manufacturer, evidence of its actions relating to other drugs, not involved in lawsuit, was not relevant and not discoverable, despite claim that it would show the manufacturer's testing procedures and "common plan" to withhold and falsify information; furthermore, whatever probative value such evidence would have would be outweighed by its tendency to portray the defendant in a damaging light with regard to past activities.

**6. Federal Civil Procedure ☜1270**

Discovery is not to be used for annoying or embarrassing the opposing party.

**7. Federal Civil Procedure ☜1272**

Plaintiffs in action against drug manufacturer were not entitled to discover information regarding the drug and its components in combination with other substances.

**8. Federal Civil Procedure ☜1623**

Court presented with attorney-client or work-product privilege claims would direct submission of documents for in camera inspection along with an index of the documents and a resume of the contents of each document.

---

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

CARL B. RUBIN, Chief Judge.

This matter is before the Court on plaintiffs' Motion to Compel Production of Documents. Involved are well over one hundred specific requests. Rather than discuss each request separately, the Court will discuss generally certain issues which are common to a number of requests, and the objections thereto. The Court will then indicate its rulings on the individual requests. Except as otherwise noted, all rulings on individual requests will be subject to the guidelines established in the general discussion of issues.

### COMMON ISSUES

#### I. Scope of Discovery

Federal Rule of Civil Procedure 26(b)(1) provides:

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the

trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

█ This rule, like all federal rules pertaining to discovery, is to be accorded broad and liberal treatment. *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 391, 91 L.Ed. 451 (1947). The rule has been construed to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978).

At the same time, discovery has necessary boundaries. Discovery of matter not "reasonably calculated to lead to the discovery of admissible evidence" is not within the scope of Rule 26(b)(1). *Id.* at 351–52, 98 S.Ct. at 2390. It is against the foregoing standards that plaintiffs' requests must be judged.

## II. Foreign Searches

█ Defendant has objected to searching for documents in the hands of its foreign subsidiaries. This position is, as a general matter, not valid.

█ Defendant Merrell-Dow Pharmaceuticals, Inc., is a multi-national corporation. By refusing to conduct foreign searches for documents, it provides for itself a means of shielding otherwise discoverable information. A discoveree cannot avoid a proper discovery request by utilizing record keeping which conceals rather than discloses. *Isaac v. Shell Oil Co.*, 83 F.R.D. 428, 431 (E.D.Mich.1979) (and cases cited therein). Furthermore, the non-party status of wholly-owned subsidiaries does not shield discoverable documents in their possession from production. *Hubbard v. Rubbermaid, Inc.*, 78 F.R.D. 631, 637 (D.Md. 1978). Therefore, except as otherwise noted, it is hereby ordered that defendant produce all documents, responsive to plaintiffs' requests, in the care, custody or control of its foreign subsidiaries.

## III. Predecessor and Successor Corporations

Due to a series of corporate reorganizations, the parties are unable to agree upon the precise identity of the discoveree. In March, 1981, Richardson-Merrell, Inc., was reorganized. Part of that corporation became Richardson-Vicks, Inc., an independent, publicly-held corporation. The remainder of Richardson-Merrell was merged with Dow Chemical to form Merrell-Dow Pharmaceuticals, Inc. In the multitude of lawsuits filed in this litigation, all of the above-named corporations have been named, in one or more Complaints, as defendants, as have predecessor corporations of Richardson-Merrell, including Merrell-National Laboratories. Plaintiffs seek discovery from all subsidiaries, and predecessor and successor corporations, of Richardson-Merrell and Merrell-Dow Pharmaceuticals.

█ As the discussion of foreign searches, *supra*, makes clear, plaintiffs may obtain discovery of documents in the care, custody or control of subsidiaries. This applies to both domestic and foreign subsidiaries. The subsidiaries involved here are those subsidiaries of Merrell-Dow Pharmaceuticals, Inc., acquired in connection with the reorganization involving Dow Chemical and Richardson-Merrell, Inc. This description should be broadly construed to include all former corporate subdivisions of Richardson-Merrell, Inc., which became part of Merrell-Dow Pharmaceuticals, Inc., regardless of the form in which those subdivisions now exist. However, this description does not include Richardson-Vicks, Inc., its subsidiaries or corporate subdivisions, or any former subsidiaries or subdivisions of Richardson-Merrell, Inc., which are now part of Richardson-Vicks, Inc. *Cf. Wood v. Merrell-Dow Pharmaceuticals, Inc.*, No. C–1–82–580 (S.D.Ohio, Dec. 15, 1982) (Order Granting in Part Leave to File Second Amended Complaint and Denying Motion to Strike) ("It is clear that Richardson-Vicks, Inc., is not a proper defendant ...") As an independent corporation, Richardson-Vicks, Inc., is not a proper discoveree. Any documents held by

Richardson-Vicks, unlike documents held by defendant's subsidiaries, are not within the care, custody or control of defendant. *See Hubbard, supra,* at 637.

The Court holds that discovery may be obtained from Merrell-Dow Pharmaceuticals, Inc., and its subsidiaries acquired in the reorganization involving Dow Chemical and Richardson-Merrell, Inc. This description should be broadly construed as explained above. The Court further holds that discovery shall extend to those documents, otherwise discoverable, which came into the care, custody or control of Merrell-Dow Pharmaceuticals, Inc., from Richardson-Merrell, Inc., or its corporate predecessors as a result of the reorganization mentioned above. Exceptions to this general holding, if any, will be specified below.

### IV. Thalidomide and MER–29

Plaintiffs seek certain information concerning defendant's experiences with Thalidomide and MER–29. Plaintiffs assert that these requests are calculated to lead to the discovery of admissible evidence of, *inter alia,* the validity of defendant's testing procedures for teratogenicity and defendant's "common plan" to withhold and falsify information.

The Court disagrees. Evidence of defendant's actions relating to Thalidomide and MER–29 is not relevant to this litigation. Whatever probative value such evidence might have would be far outweighed by its potential prejudice to defendant. In addition, plaintiffs' requests in this area do not appear reasonably calculated to lead to the discovery of admissible evidence. Rather, the requests appear calculated to produce information which would portray defendant in a damaging light with regard to some of its past activities. Discovery is not to be used for annoying or embarrassing the opposing party. See Fed.R.Civ.P. 26(c). The Court holds that any inquiry into defendant's connection with or activities concerning Thalidomide or MER–29,

including any teratogenicity testing not involving Bendectin or its components, is beyond the scope of discovery. The Court orders that discovery on these matters not be had.

### V. Combinations With Other Substances

In many of their requests, plaintiffs seek information concerning Bendectin and its components, "either alone or in combination with any other substance." Defendant has consistently objected to the inclusion of the quoted phrase, on the basis that information elicited thereunder would be irrelevant to this litigation.

After careful consideration, the Court agrees with defendant. Contrary to plaintiffs' assertion, evidence of a component's teratogenicity with one substance is not probative of its teratogenicity with another substance, nor are the procedures used in testing one combination probative of those used in testing another. Plaintiffs' requests, insofar as they seek information regarding Bendectin or its components in combination with substances not found in Bendectin, are beyond the scope of permissible discovery.[1] The Court orders that, unless otherwise specified below, discovery into this area not be had.

### VI. Attorney-Client and Work-Product Privilege

In numerous instances, defendant has asserted attorney-client or work-product privilege as a bar to discovery. With respect to those requests, in cases where the Court has ruled in favor of plaintiffs, the following procedure will be used: Defendant will submit for *in camera* inspection those documents for which they are claiming either attorney-client or work-product privilege. Defendant will also submit, for the Court's benefit, an index of those documents, which will include an indication of the particular privilege claimed for each document. Finally, defendant will submit a brief resume of the contents of

---

**1.** This holding should not be construed to limit, in any way, plaintiffs' discovery of information, including testing data, pertaining to Bendectin and its components, either alone or in combination with other Bendectin components.

each document for which a privilege is asserted.

The Court will spot check the submitted resumes against the corresponding documents, to assure itself of the accuracy of the resumes. The Court will then rule, based on the descriptions in the resumes. None of the materials submitted by defendant will be divulged or made available to plaintiffs or their counsel.

## VII. Miscellaneous Matters

In interpreting the Court's rulings on individual requests, the parties should keep the following considerations in mind. Where defendant has asserted that a certain request is no longer at issue,[2] and the Court has ruled in plaintiffs' favor, the Court's ruling is subject to any understanding or agreement reached by the parties. Similarly, in those cases where defendant has objected to the request but agreed to supply certain information, and the Court has ruled in defendant's favor,[3] the Court's ruling is subject to the understanding that defendant will supply that information. In those cases where defendant has not objected to the request,[4] the Court has assumed that discovery is proceeding smoothly and has seen no need to rule on the request.

Finally, in those cases where defendant has stated that the material sought does not exist, and the Court has ruled in plaintiffs' favor,[5] the Court's ruling is subject to the understanding that, obviously, defendant need not produce material that does not exist. *See SEC v. Canadian Javelin Ltd.,* 64 F.R.D. 648, 651 (S.D.N.Y.1974), *appeal dismissed,* 538 F.2d 313 (2nd Cir.1976).

## RULINGS ON INDIVIDUAL REQUESTS

Subject to the foregoing discussion, the Court rules as follows on plaintiffs' individual requests:[6]

**2.** *See, e.g.,* requests 6.1, 6.14, 9.18, 9.20.

**3.** *See, e.g.,* requests 5.18, 5.19, 6.19, 7.11.

**4.** *See, e.g.,* requests 1.8, 1.9, 5.11, 5.12, 5.13. *See also* requests 12.1–12.7.

With respect to the following requests, plaintiffs' Motion is hereby GRANTED: 1.3–1.7, 1.10–1.12; 2.1–2.3, 2.6, 2.7, 2.10, 2.12; 3.1; 4.1–4.3; 5.1–5.4, 5.8, 5.10, 5.14–5.17, 5.23, 5.24, 5.26, 5.28; 6.1, 6.3, 6.4, 6.7–6.12, 6.14, 6.16, 6.20; 7.5–7.8; 8.1–8.4, 8.6, 8.8–8.10, 8.12, 8.13, 8.15–8.18, 8.23, 8.24; 9.12, 9.16, 9.18, 9.20; 10.6, 10.7, 10.9–10.11, 10.13, 10.14; 11.2, 11.8, 11.9, 11.16; 13.1.

With respect to the following requests, plaintiffs' Motion is hereby GRANTED only insofar as the requests pertain to Bendectin and its components: 5.21, 5.22; 8.22; 11.13, 11.14.

With respect to the following requests, plaintiffs' Motion is hereby GRANTED only insofar as the requests comport with the Court's earlier discussion and insofar as they do not relate to teratology in general: 9.2, 9.3, 9.5–9.10; 10.1–10.3, 10.8.

With respect to requests 11.5 and 11.6, plaintiffs' Motion is hereby GRANTED, only insofar as those requests pertain to the United States.

With respect to request 6.6, plaintiffs' Motion is hereby GRANTED, and defendant is hereby ordered to supplement its response every 90 days.

With respect to request 6.22, plaintiffs' Motion is hereby GRANTED subject to the Court's earlier discussion and subject to a limitation to teratological effects.

With respect to the following requests, plaintiffs' Motion is hereby DENIED: 2.11, 2.13–2.18; 5.7, 5.9, 5.18–5.20, 5.25, 5.30; 6.17, 6.19; 7.1–7.4, 7.9–7.11; 8.7, 8.19, 8.20, 8.26; 9.4, 9.11, 9.15, 9.19, 9.22; 10.12; 11.1, 11.3, 11.4, 11.10–11.12, 11.23, 11.34.

With respect to the following requests, plaintiffs' Motion is hereby DENIED for vagueness: 5.6; 6.18; 9.21.

**5.** *See, e.g.,* requests 5.10, 11.8.

**6.** All groupings are inclusive.

**1276**

With respect to the following requests, plaintiffs' Motion is hereby DENIED for overbreadth: 8.21; 9.1; 11.7, 11.28.

With respect to request 11.30, plaintiffs' Motion is hereby DENIED except insofar as request 11.30 is contained in request 11.2.

IT IS SO ORDERED.